UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


| | | |
|---|---|---|
| CITY OF DALLAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | No. 3:23-CV-02367-K |
| | ) | |
| TRIPLE D GEAR, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| TRIPLE D GEAR, LLC, | ) | |
| | ) | |
| Counter-Claimant, | ) | |
| | ) | |
| VS. | ) | No. 3:23-CV-02367-K |
| | ) | |
| CITY OF DALLAS, | ) | |
| | ) | |
| Counter-Defendant. | ) | |
| _____ | ) | |


BENCH TRIAL PROCEEDINGS
BEFORE THE HONORABLE ED KINKEADE
UNITED STATES DISTRICT JUDGE
OCTOBER 7, 2025
DALLAS, TEXAS

FOR THE PLAINTIFF:

    MEGAN M. O'LAUGHLIN
    HITCHCOCK EVERT, LLP
    5802 Tremont Street
    Dallas, TX  75214
    (214) 880-7004

    ANNE M. TURNER
    HITCHCOCK EVERT, LLP
    750 North St. Paul Street, Suite 1110
    Dallas, TX  75201
    (214) 953-1161

STACY RODRIGUEZ
CITY OF DALLAS
GENERAL LITIGATION SECTION CHIEF

DAISY FAST
CITY OF DALLAS
DIRECTOR -- OFFICE OF COMMUNICATIONS
AND CUSTOMER EXPERIENCE

FOR THE DEFENDANT:

WARREN V. NORRED
NORRED LAW, PLLC
515 E. Border Street
Arlington, TX  76010
(817) 704-3984

Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.
_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
1100 Commerce Street, 15th Floor
Dallas, TX  75242
(214) 753-2325

### INDEX

OPENING STATEMENT BY MS. O'LAUGHLIN . . . . . . . . . .    7

OPENING STATEMENT BY MR. NORRED . . . . . . . . . . . .    11


Plaintiff's
Witnesses:          Direct     Cross     Redirect     Recross


DAISY FAST              16        41          43


Defense
Witnesses:          Direct     Cross     Redirect     Recross


ARTURO SANCHEZ          49        66          87


CLOSING ARGUMENT BY MS. O'LAUGHLIN . . . . . . . . . .    92

CLOSING ARGUMENT BY MR. NORRED . . . . . . . . . . . .    97

REBUTTAL ARGUMENT BY MS. O'LAUGHLIN  . . . . . . . . .    106

### EXHIBITS

| Plaintiff's Exhibits | Introduced | Admitted |
|---|---|---|
| 49 | 26 | 26 |
| 50 | 30 | 30 |
| 51 | 22 | 23 |

```
 1                    (PROCEEDINGS BEGAN AT 9:10 AM.)

 2          THE COURT:  Okay.  We're here on the City of Dallas

 3   versus Triple D Gear, LLC, Cause No. 3:23-CV-02367-K, for a bench

 4   trial.

 5          I apologize I wasn't here yesterday.  We're going

 6   today.

 7          And we've got Ms. O'Laughlin here for the City of

 8   Dallas.  Are you here?

 9          MS. O'LAUGHLIN:  Yes, Your Honor.

10          THE COURT:  There you are.  And Anne Turner?

11          MS. TURNER:  Yes, Your Honor.

12          THE COURT:  And Stacy Rodriguez?

13          MS. RODRIGUEZ:  Yes, sir.

14          THE COURT:  And Daisy Fast.

15          MS. FAST:  Yes, Your Honor.

16          THE COURT:  All right.  And I believe that's everybody.

17   And y'all are ready.  Who's the lead counsel?

18          MS. O'LAUGHLIN:  I am, Your Honor.

19          THE COURT:  Okay, great.  I'll be looking to you.

20          And for the Defendants, Mr. Warren Norred.  You're

21   here, sir.

22          MR. NORRED:  Yes, Your Honor.

23          THE COURT:  You didn't have a beard when I taught you.

24          MR. NORRED:  No, I did not.

25          THE COURT:  Okay.  You're getting old.  I warned you
```

```
 1   against getting old, Mr. Norred, and you did not do anything
 2   about it.
 3             MR. NORRED:  You did.
 4             THE COURT:  Okay.  Well, maybe we can't do anything
 5   about that, but it's good to see you.  You've gotten taller and
 6   skinnier.  Looks good.
 7             MR. NORRED:  Thank you, Your Honor.
 8             THE COURT:  All right.  And Gabriel Hoffman.
 9             MR. HOFFMAN:  Yes, Your Honor.
10             THE COURT:  You're the paralegal?
11             MR. HOFFMAN:  Yes, Your Honor.
12             THE COURT:  Good.  That's one of those ties from that
13   group.  What is it?  Grateful Dead?  Isn't that a Grateful Dead
14   tie?
15             MR. HOFFMAN:  It looks awfully similar but, no,
16   Your Honor.
17             THE COURT:  It's not?  Okay.  Well, it's a knockoff of
18   a Grateful Dead tie.  It looks good.
19             MR. HOFFMAN:  Thank you, Your Honor.
20             THE COURT:  All right.  Arturo Sanchez is here?
21             MR. SANCHEZ:  Yes, Your Honor.
22             THE COURT:  You own the LLC?
23             MR. SANCHEZ:  Yes, Your Honor.
24             THE COURT:  Okay.  And Diane Zugg is here somewhere or
25   not?  Is she not here?
```

```
 1                MR. NORRED:  She has not made it, Your Honor.

 2                THE COURT:  Okay.  That's okay.

 3                All right.  Everybody's ready?

 4                MR. NORRED:  We are.  And just so the Court knows,

 5    Mr. Hoffman will be leaving mid-morning because he's taking the

 6    LSAT later this morning.

 7                THE COURT:  They changed it to today?

 8                MR. NORRED:  Yes, sir, for the third time.

 9                THE COURT:  Have you studied?

10                MR. HOFFMAN:  Yes, sir.

11                THE COURT:  Got to get your grade up a little bit?

12                MR. HOFFMAN:  Yes, sir, hopefully.

13                THE COURT:  Where do you want to go to school?

14                MR. HOFFMAN:  A&M.

15                THE COURT:  I used to teach over there.  That's where I

16    taught that man.

17                MR. HOFFMAN:  Yes, sir.

18                THE COURT:  It wasn't A&M then.  It was a real school

19    then.  Okay.  No; good.  That's great.  Well, good luck.  Where

20    are you taking it?  Over at SMU?

21                MR. HOFFMAN:  Via a test location in Denton, sir.

22                THE COURT:  Oh, that's right.  They have those testing

23    locations now.  Well, that's good.  You'll do fine.  We'll be

24    hoping the best for you.  Okay, buddy?

25                MR. HOFFMAN:  Thank you.
```

```
 1                THE COURT:  All right.  And everybody is ready?

 2                MS. O'LAUGHLIN:  We're ready, Your Honor.

 3                THE COURT:  All right.  Do y'all want to make an

 4   Opening Statement or do you just want to get -- call your first

 5   witness?

 6                MS. O'LAUGHLIN:  We would like to make a brief Opening

 7   Statement.

 8                THE COURT:  It's going to be brief because I'm going to

 9   cut you off at no -- not one second over five minutes.  Okay?

10                MS. O'LAUGHLIN:  I understand, Your Honor.

11                THE COURT:  All right.  Go ahead.  Start now.

12                MS. O'LAUGHLIN:  Your Honor, we're here today

13   because -- in the words of Defendant's own CEO -- Defendant took

14   the City's logo.  And we'd like to play a brief clip for

15   Your Honor.

16                THE COURT:  Okay.

17                (Video clip referred to played in open court.)

18                THE COURT:  Okay.

19                MS. O'LAUGHLIN:  We're here today to cancel three

20   registrations, two for the Tilted Star Logo which is the logo

21   depicted in that video.

22                THE COURT:  I see it.

23                MS. O'LAUGHLIN:  And one is for the Ghost Logo which is

24   the three concentric Ds that just look like the City of Dallas'

25   logo.
```

```
1              THE COURT:  I know which one it is.

2              MS. O'LAUGHLIN:  Yes.  So the first basis:  Priority

3    and likelihood of confusion.

4              The City has been using its logo for over 50 years.

5              THE COURT:  How long?

6              MS. O'LAUGHLIN:  For over 50 years.

7              THE COURT:  Okay.

8              MS. O'LAUGHLIN:  It started in 1972.

9              THE COURT:  Before you were born.

10             MS. O'LAUGHLIN:  It is before I was born, just barely.

11             THE COURT:  Okay.  There you go.

12             MS. O'LAUGHLIN:  Yes, Your Honor.

13             We have T-shirts bearing the City's logo going back to

14   at least 2005 to present to Your Honor.

15             As far as priority, the Defendant has not been able to

16   tell a straight coherent story about when his logos were even

17   designed, much less first used.

18             So if you will look at the slides, he has testified at

19   different times that the Ghost Logo was designed before the

20   Tilted Star Logo.  Then he said it was designed in 2000 or 2006,

21   then late 2007, and then around like 2007 which could also mean

22   2006.  And then when he went to submit the declaration in support

23   of the Defendant's Motion for Summary Judgment, he went back to

24   late 2007.

25             Now we know, based on his testimony, none of this can
```

1   be true, and you're not going to have any credible evidence that

2   they used either logo in 2007 or 2006.  And you're certainly not

3   going to have any credible evidence that they used the Ghost Logo

4   before they filed their application in 2020.

5           The other two counts for cancellation are based on

6   fraud on the Trademark Office and to rectify the register which

7   gives Your Honor the ability to cancel registrations for any

8   reason if Your Honor finds that the registration should not

9   exist.

10          The cleanest way to cancel them and what was the

11  primary basis for our partial Motion for Summary Judgment is that

12  Defendant did not own the marks when the applications were filed.

13  The first application for the first Tilted Star Logo was filed by

14  Ahmed Youssef as an individual.  The State -- The uncontested

15  facts that were submitted to Your Honor in the Joint Pretrial

16  Order admits that Mr. Youssef did not own the mark on the date he

17  filed this application.

18          The Defendant gave ---

19          THE COURT:  How is Mr. Youssef involved in all of this?

20          MS. O'LAUGHLIN:  Mr. Youssef was a partner in the LLC

21  originally.

22          THE COURT:  Okay.  I follow you.

23          MS. O'LAUGHLIN:  Mr. Sanchez bought him out --

24          THE COURT:  Okay.

25          MS. O'LAUGHLIN:  -- around the 2018, 2019 time period.

```
 1              THE COURT:  Okay.  I get it.

 2              MS. O'LAUGHLIN:  Yes.  So the interrogatory answers

 3    are -- say that -- word Mr. Sanchez, as an individual, owns the

 4    Ghost Logo.  So, again, when the application was filed in the

 5    name of the LLC, it was not the correct owner.

 6              As far as the fraud on the USPTO, we also have

 7    uncontested evidence and facts and the stipulated facts that the

 8    Defendant claimed goods in the applications that were not

 9    offered; that the Defendant filed a statement of use for one of

10    the applications claiming goods that were not offered.  And we

11    also know, based on that video that Your Honor saw, that they

12    knew of the City's logo and the City's rights.  Yet, swore to the

13    USPTO that they knew of no one within any rights in the logos

14    that they were trying to register.

15              So there are three independent bases to cancel these

16    registrations, and we will ask Your Honor to make findings on all

17    three of those.

18              Thank you.

19              THE COURT:  Okay.  Oh, I have one question.

20              MS. O'LAUGHLIN:  Yes.

21              THE COURT:  Now the ruling by the TTAB, my

22    understanding, you didn't get the ruling you wanted but that you

23    can offer additional evidence since this is a de novo hearing.

24    Is that right or wrong?

25              MS. O'LAUGHLIN:  That is correct, Your Honor.
```

```
 1                    THE COURT:  Okay.  That's all.  Thank you.

 2                    MS. O'LAUGHLIN:  All right.  Thank you, Your Honor.

 3                    THE COURT:  Mr. Norred?

 4                    MR. NORRED:  Good morning, Your Honor.  It is a

 5       distinct pleasure to be here.

 6                    THE COURT:  Oh, it's my pleasure.

 7                    MR. NORRED:  Thank you for having us.

 8                    This is our Plaintiff's petition, First Amended

 9       Petition.  So just like the rendition of allegations that you

10       just heard a minute ago, I just wanted to respond real briefly to

11       this same -- this is the same or the initial version of what you

12       just saw.

13                    THE COURT:  Stop.

14                    Ronnie, can you turn that microphone up some?

15                    MR. NORRED:  I can be louder, too.

16                    Fifty years of use and municipal services is not 50

17       years ---

18                    THE COURT:  Wait, wait.  Are you back on the record

19       here?

20                    COURT REPORTER:  Yes, I am.

21                    THE COURT:  Okay, good.  Thank you.

22                    Go ahead.

23                    MR. NORRED:  Fifty years of selling municipal services

24       and garbage pickup is not 50 years in any other class or any

25       other natural expansion which is where our client is today.
```

12

1              The client points or the Plaintiff points out that

2     Youssef, who is my client's -- one of the -- one of the original

3     owners of Triple D, filed the application in his own name, and

4     that was an error and we all understand that.

5              And then we see that what opposing counsel has down is

6     found all the places where my client or any one of his allies

7     have been inconsistent over the last nearly 20 years and said,

8     "See, he's lying."  But -- But this first Tilted Star Logo has

9     reached incontestability.  It's done all the things it's supposed

10    to do, so she has to show fraud.  And so we don't think that she

11    can show fraud.  What she can show is that we have some very

12    unsophisticated players that are filing things in a way that is

13    maybe less precise than we would like to see, but it's not fraud.

14    And so that's going to be what happened here.

15             You'll see that there's a Christopher Cain who is

16    President of Rich Mind Records.  When he's doing this work,

17    you'll see Youssef, who is a member of Rich Mind Records, when

18    he's filing this trademark application, Christopher Cain, of

19    course, was President.  So he was an independent.  The

20    application shows products being sold by Rich Mind Records as the

21    specimen.  So it's not as though he's doing something completely

22    different.  Everything he does he's doing as Rich Mind Record's

23    agent.

24             Opposing counsel wants to say, "Well, poof!  You got to

25    void an application that can't be fixed."

1          And I'll just skip down to the bottom.

2          The -- And you'll see some other things where they talk

3     about this Jesus Remedios Manqueros transferred his intellectual

4     property rights in the Tilted Star Logo to Defendant.  There are

5     a number of places where opposing counsel characterizes this --

6     these things as "transferring intellectual property," which

7     you'll see as there are disputes, and there's a release, and

8     you'll see that there's no acknowledgment that -- that the other

9     party, the Jesus, actually owned anything.  It's simply a release

10    of a dispute.

11         And then he also adds, just like we all do when we have

12    a settlement to the extent we need to, we -- we assign everything

13    else, but it's just a release of a claim.  It's not a

14    transferring of his intellectual property rights as is being

15    indicated.

16         The last thing I'll mention is 15 USC 1507(e) allows

17    amendment of a party ownership.  So what should have happened

18    back in the day is whenever my client recognized that it was

19    filed in the wrong name, he should have filed a petition with

20    the -- with the USPTO to change the name because there was a

21    mistake made.  1507 -- 1507(e) allows that.  It's a perfectly

22    reasonable way to go.

23         That's not what happened.  What happened was he just

24    did an assignment.  And whenever Arturo Sanchez confronted Jesus

25    or confronted Youssef and said, "Hey, why did you do it this

 1    way," he -- he just assigned it over.  Then it became contestable

 2    later.

 3            Now irrespective of whether that was the right way to

 4    do it, it wasn't fraud.  It was fixed.  It's been incontestable,

 5    and that's what our position is going to be.

 6            Thank you, Your Honor.

 7            THE COURT:  When was it fixed?

 8            MR. NORRED:  It was fixed in 2017, I believe.  There's

 9    -- You'll hear -- What you'll hear is testimony that the LLC of

10    Triple D Gear was originally filed with just Youssef as the only

11    member, and only whenever -- when Arturo Sanchez went to get some

12    paperwork done did he realize that Youssef had put all of these

13    documents --

14            THE COURT:  In his own name.

15            MR. NORRED:  -- in his own name.  And so at that point

16    he recognized all of it and it all got fixed.

17            THE COURT:  And there's no time limit on that?

18            MR. NORRED:  Not to my knowledge.

19            THE COURT:  Well, I mean it's your knowledge I'm

20    relying on here.

21            MR. NORRED:  I -- I don't see that there's -- I think

22    that you can go back -- If we had committed actual fraud 25 years

23    ago, opposing counsel would have -- would have the ability to

24    do -- There's no time limit on that.  If you have fraud, if you

25    have purposeful fraud, you can go back all the way.

15

1          THE COURT:  Well, without fraud, you can change it a

2   hundred years later?

3          MR. NORRED:  I believe so, --

4          THE COURT:  Okay.

5          MR. NORRED:  -- yeah.  1507 doesn't say otherwise.

6          THE COURT:  Okay.  All right.

7          MR. NORRED:  Thank you.

8          THE COURT:  All right.  Call your first witness.

9          MS. O'LAUGHLIN:  The City calls Daisy Fast.

10          THE COURT:  Okay.  Have you got all your witnesses --

11   Has everybody got all their witnesses here?  And is there going

12   to be -- Are y'all going to invoke the rule or "no"?

13          It doesn't matter to me.

14          MS. O'LAUGHLIN:  Ms. Fast is the only City

15   representative who will be testifying.  Our only other witness is

16   Mr. Sanchez.

17          THE COURT:  Okay.  How about on your side?

18          MR. NORRED:  It's just -- It's just Mr. Sanchez.

19          THE COURT:  Just Mr. Sanchez?

20          MR. NORRED:  Yes, sir.

21          THE COURT:  Okay.  Okay.  Well, all right.  Let's get

22   this lady sworn in.

23          Stand up, ma'am.

24          COURTROOM DEPUTY:  Do you solemnly swear to tell the

25   truth, the whole truth, and nothing but the truth, so help you

```
 1   God?

 2              THE WITNESS:  I do.

 3              THE COURT:  Ma'am, that chair does not move except to

 4   kind of spin around, so you'll have to lean up and talk into the

 5   microphone.  Don't scoot it back.  Scoot it toward you.

 6              There you go.

 7              THE WITNESS:  Thank you.

 8              THE COURT:  And I'm sorry that it's not very

 9   comfortable, but whoever designed this courtroom, that's the way

10   they made it, and I apologize.  So just make sure -- If you can

11   hear your voice, then you're -- you're loud enough.  Okay?

12              THE WITNESS:  Okay.

13              THE COURT:  Okay.  Here we go.  That was good.

14                        DIRECT EXAMINATION

15   QUESTIONS BY MS. O'LAUGHLIN:

16   Q.   Please introduce yourself to the Court.

17   A.   Good morning.  My name is Daisy Fast.

18   Q.   Are you currently an employee of the City of Dallas?

19   A.   Yes.

20   Q.   What is your current position?

21   A.   Currently I'm the Director of the Office of Communications

22   and Customer Experience which includes the Call Center for the

23   City of Dallas.

24   Q.   What are your responsibilities in that role?

25   A.   As the Director, I oversee literally over 140 positions in
```

1    personnel.  One division is the 24/7 Call Center which provides

2    non-emergency calling services for residents and visitors, and

3    then the other division, I oversee the City's media relations,

4    marketing and graphic design services.

5    Q.   And with those latter responsibilities, do you have any

6    involvement with the use of the City's logo?

7    A.   Yes, I do.

8    Q.   All right.  Have you had any other positions as an employee

9    of the City?

10   A.   I have.  I actually started with the City in 2007 as a temp

11   employee.

12   Q.   And what were your responsibilities as a temp employee in

13   2007?

14   A.   I started as a temporary accountant for the Human Resources

15   Department.

16   Q.   Okay.  And how long did you have that employment status?

17   A.   About a year.

18   Q.   And did you have a role after that temp position?

19   A.   Yes.  I transitioned to a permanent position, still within

20   the Human Resources Department, doing compensation analysis.

21   Q.   And when did you have that role?

22   A.   I transitioned to a permanent employee in 2008.

23   Q.   What were your job duties in that role?

24   A.   I reviewed position management, pay grades and compensation

25   for the City.

1  Q.   Okay.  Did you have any other roles with the City between

2  that first and second job and the one you currently have?

3  A.   Yes.  I had several.  I transitioned out of the Human

4  Resources Department to -- at the time it was called the Office

5  of Intergovernmental Services to lead the City's 2010 census

6  efforts.  And then that segued to the redistricting project.  So

7  once we received the data from the 2010 census, I helped

8  coordinate the redistricting commission that was formed to

9  redistrict the City Council districts.

10  Q.   And after working for the Intergovernmental unit, did you

11  have a different role with the City?

12  A.   I did.  I transitioned to the Budget Office.  I started as a

13  Senior Budget Analyst, and then I worked my way up to a Manager

14  position in the Budget Office.

15       After the Budget Office, there was a promotion opportunity

16  to become the Assistant Director at the municipal court, and so I

17  oversaw the Court Clerk operations at the Dallas Municipal Court

18  for about four years.

19       And then there was a promotion opportunity to transition to

20  become the Director of 311, and so I became the Director of 311.

21       And then two years ago we -- I'm sorry -- a year ago we

22  absorbed the marketing, branding, and graphic design for the

23  City.

24  Q.   All right.  Have you fully described all of your different

25  employment roles with the City over the course of the years?

1    A.    I have.

2    Q.    All right.  Thank you.

3          In your current role, do you have any responsibilities as

4    they relate to the retention, storage and retrieval of the City's

5    records?

6    A.    Yes, I do.

7    Q.    What are those responsibilities?

8    A.    So as city employees, our day-to-day activities involve

9    handling all kinds of city records.  Those records involve

10   certain retention schedules, just depending on the type of

11   record.  And so we receive a Records Retention Schedule from the

12   City Records Manager, and we're responsible to retain, destroy or

13   archive them based off of that information.

14   Q.    Can you describe what the City's archive is?

15   A.    Sure.  It's a depository of city records.

16   Q.    And what kind of records does the City archive?

17   A.    We archive photographs, newspaper clippings, e-mails,

18   paperwork, memos.  It varies.

19   Q.    Is there a reason why it's important to archive city

20   records?

21   A.    Yes.  To document historical events or just to document

22   important government actions and to adhere to record retention

23   laws.

24   Q.    Okay.  Can you describe the process by which a record ends

25   up in the City's archive?

1    A.   Yes.  So, again, referring back to the Records Retention

2    Schedule that we're provided, it does vary by department, but

3    just depending on the record, we follow the Retention Schedule,

4    and we'll engage the archivist when necessary.

5    Q.   At what point do you engage the archivist?

6    A.   The archivist can be engaged really at any point.  He serves

7    as a resource for city employees for questions, you know,

8    inquiries.  But once we get -- reach the point to actually file

9    or submit something to the City Archives, we just reach out to

10   him via e-mail or phone call.

11   Q.   All right.  Does the City have any guidelines in place to

12   ensure that only accurate records end up in the City's archive?

13   A.   Yes.  We follow the Records Retention Schedule that's

14   provided.

15   Q.   All right.  Is there any more detail about the Record

16   Retention Schedule you could give us?

17   A.   Not that I can think of.

18   Q.   Okay.  Is it important that only accurate information ends

19   up in the City's archive?

20   A.   Yes, absolutely.

21   Q.   Why?

22   A.   Because that represents, you know, either an official

23   government action.  It represents the work specific to a project

24   or initiative for the City.

25   Q.   All right.

```
 1              MS. O'LAUGHLIN:  Ms. Turner, could you pull you up
 2   Exhibit 1?
 3   Q    (By Ms. O'Laughlin) Do you recognize this?
 4   A.   Yes, I do.
 5   Q.   What is it?
 6   A.   That is the City of Dallas logo.
 7   Q.   When I refer to the City's logo during questioning, will you
 8   understand that I'm referring to this --
 9   A.   Yes.
10   Q.   -- mark depicted?
11              MS. O'LAUGHLIN:  All right.  Ms. Turner, can you pull
12   up Exhibit 2?
13   Q    (By Ms. O'Laughlin) Do you recognize this?
14   A.   Yes.
15   Q.   What is this?
16   A.   That is the City of Dallas logo without the leaf in the
17   middle.
18   Q.   Okay.  During your testimony, I will ask questions where I
19   refer to the "Ghost Logo."  Will you understand I'm referring to
20   this image when I ask about the "Ghost Logo"?
21   A.   Yes.
22              MS. O'LAUGHLIN:  Ms. Turner, could you pull up
23   Exhibit 3?
24   Q    (By Ms. O'Laughlin) Do you recognize this?
25   A.   Yes.
```

1   Q.   What is this?

2   A.   That is the City of Dallas logo with the star in the middle.

3   Q.   During your testimony I may ask questions that refer to the

4   "Tilted Star Logo."  Will you understand that I'm referring to

5   the image in Exhibit 3 when I refer to the "Tilted Star Logo"?

6   A.   Yes.

7        MS. O'LAUGHLIN:  Ms. Turner, can you pull up Exhibit 1

8   again?

9   Q   (By Ms. O'Laughlin) Do you know when the City first used the

10  City's logo?

11  A.   Yes.  It was in August of 1972.

12  Q.   Okay.

13       MS. O'LAUGHLIN:  Ms. Turner, could you pull up

14  Exhibit 51?

15  Q   (By Ms. O'Laughlin) Do you know what this is?

16  A.   Yes.  It looks like it's a page from the *Dallas Morning News*

17  newspaper.

18  Q.   Can you read the date on it?

19  A.   It says Friday, August 11th, 1972.

20       MS. O'LAUGHLIN:  And, Ms. Turner, if you'll scroll.

21  Q   (By Ms. O'Laughlin) Do you see the City's logo on this?

22  A.   I do.

23       MS. O'LAUGHLIN:  Your Honor, we offer Exhibit 51.

24       THE COURT:  Any objection?

25       MR. NORRED:  No, Your Honor.

```
 1              THE COURT:  It's admitted into evidence.

 2              MS. O'LAUGHLIN:  Ms. Turner, will you pull up Exhibit 1

 3   again?

 4   Q    (By Ms. O'Laughlin) During your years as an employee of the

 5   City, what kinds of things have you seen that bear the City's

 6   logo?

 7   A.   Several things, whether it's clothing, hats, memo templates,

 8   presentations, pens, buildings, you know, official city signage.

 9   Q.   Okay.  When you mentioned "clothing," does that include

10   T-shirts for others?

11   A.   Yes.

12   Q.   Are these T-shirts for others that bear the City's logo

13   distributed to members of the public?

14   A.   Yes, they are.

15   Q.   When the City distributes these items of apparel with the

16   City's logo on it, does it charge the members of the public to

17   receive the apparel?

18   A.   No, we don't.

19   Q.   With regard to these same items of apparel that bear the

20   City's logo and are distributed to members of the public, does

21   the City limit these giveaways to residents of the City of

22   Dallas?

23   A.   No, we don't.

24   Q.   With regard to these same items of apparel that bear the

25   City's logo and are given away to members of the public, how long
```

1    have you been an employee of the City of Dallas the first time

2    you had knowledge of such a giveaway?

3    A.    I would say it was during the 2010 census project.  My main

4    role was to be out in the community and promote the 2010 census

5    and encourage participation.  And so that was when I was more

6    involved with community engagement and giveaways.

7    Q.    And did you personally give away T-shirts that bore the

8    City's logo to members of the public?

9    A.    I did.

10   Q.    What is the purpose of placing the City's logo on items of

11   apparel that are given to the public?

12   A.    It's to continue to promote our brand.  The logo represents

13   the City's image and the reputation of the City.

14   Q.    All right.  I'm going to ask Ms. Turner to ---

15           THE COURT:  Do you know who did that logo or drafted it

16   or some professional firm or some individual with the City or do

17   we even know?

18           THE WITNESS:  It's my understanding that it was

19   outsourced to a graphic design firm at the time.

20           THE COURT:  Okay.

21           MS. O'LAUGHLIN:  Ms. Turner is placing some T-shirts on

22   the Elmo so that you can see what they are.  These have been

23   marked as the City's Exhibit 49.

24           THE COURT:  Turkey Trot.

25           MS. O'LAUGHLIN:  Turkey Trot.

1   Q   (By Ms. O'Laughlin) Do you recognize this item of apparel?

2   A.   Yes.  It's a Turkey Trot shirt.

3   Q.   And if we turn to the back of the shirt, do you see the

4   City's logo on this T-shirt?

5   A.   Yes, I do.

6   Q.   And is it your understanding that these T-shirts are given

7   to the members of the public who register for the Turkey Trot?

8   A.   Yes, that's correct.

9   Q.   All right.  We're going to look at another T-shirt that is

10   also part of Exhibit 49.  Do you recognize this T-shirt?

11   A.   Yes, I do.

12   Q.   And what is this?

13   A.   It is the -- a shirt given out during the Turkey Trot.

14   Q.   Do you see the City's -- City of Dallas' logo on this

15   T-shirt?

16   A.   Yes, I do.

17   Q.   All right.  And then the third shirt, do you recognize this

18   T-shirt?

19   A.   Yes.  It's a Turkey Trot shirt.

20   Q.   Do you see the City of Dallas' logo on this T-shirt?

21   A.   Yes, I do.

22   Q.   Why do these T-shirts bear the City's logo?

23   A.   The City of Dallas will allow logos to be used when we

24   sponsor or partner with certain events or activities.

25   Q.   So the fact that these T-shirts bear the City's logo means

26

```
 1  the City has sponsored this event, correct?

 2  A.   Correct.

 3  Q.   Okay.

 4           MS. O'LAUGHLIN:  We offer Exhibit 49.

 5           THE COURT:  Any objections?

 6           MR. NORRED:  No, Your Honor.

 7           THE COURT:  All those in Exhibit 49 are admitted into

 8  evidence.  Do we get to keep the T-shirts?  Oh, there you go.

 9           MS. O'LAUGHLIN:  They are an official exhibit, so you

10  do keep the T-shirts, if you want.

11           THE COURT:  All right.  They better be double XL.

12  That's all I have to say.

13           MS. O'LAUGHLIN:  I believe they all say "XL."  I don't

14  know for sure.  Ms. Turner can tell you.

15  Q    (By Ms. O'Laughlin) Do you know if all the participants in

16  the Turkey Trot are residents of the City of Dallas?

17  A.   No, they're not.

18  Q.   Have you seen documents demonstrating that people from other

19  cities participate in the Turkey Trot?

20  A.   Yes, I have.

21  Q.   What about people from other states?

22  A.   Yes.

23  Q.   What about people from other countries?

24  A.   Yes.

25           MS. O'LAUGHLIN:  Ms. Turner, can you pull up
```

27

1    Exhibit 80?

2    Q    (By Ms. O'Laughlin) Is this one of the documents that you've

3    seen that indicate people from other cities, states and countries

4    participate in the Turkey Trot?

5    A.   Yes, it is.

6              MS. O'LAUGHLIN:  And, Ms. Turner, if you could pull up

7    81.

8    Q    (By Ms. O'Laughlin) Is this another one of the documents

9    that you've seen that indicate that people from other cities,

10   states and countries participate in the Turkey Trot?

11   A.   Yes, it is.

12   Q.   And it's your understanding that every participant in the

13   Turkey Trot receives one of these participant shirts that bear

14   the City's logo?

15   A.   Yes, that's correct.

16   Q.   I'd like to turn to some of the services that the City has

17   used the mark on.

18        Does the City have a marking connection with the library

19   services?

20   A.   Yes, it does.

21   Q.   Do consumers have to pay to use the library services?

22   A.   No, not anymore.

23   Q.   Does the City use the logo in connection with park services?

24   A.   Yes.

25   Q.   Does a consumer have to pay to go into a city park?

1  A.    No.

2  Q.    Can tourists go into the city parks for free?

3  A.    Yes.

4          MS. O'LAUGHLIN:  Ms. Turner, could you, please, pull up

5  Exhibit 50?

6  Q    (By Ms. O'Laughlin) Ms. Turner is going to scroll through

7  the pages on this exhibit.

8          I would like you to focus on the ---

9          THE COURT:  Stop.

10         (The Court paused to inquire about his realtime hookup

11  technology.)

12         THE COURT:  Back on the record.

13         MS. O'LAUGHLIN:  All right.  Ms. Turner, if you'll go

14  to the last two pages and then the last page.

15  Q    (By Ms. O'Laughlin) Do you recognize this T-shirt?

16  A.    Yes, I do.

17  Q.    What is it?

18  A.    It appears to be a shirt that was provided to celebrate the

19  anniversary of the Independence of Mexico.

20  Q.    And do you see the date on that T-shirt?

21  A.    Yes, 2005.

22  Q.    All right.  And if you look at the back of the shirt, which

23  is Page 17, do you see the City's logo on this T-shirt?

24  A.    Yes, I do.

25  Q.    Do you know whether this T-shirt came from the City's

1   archive?

2   A.   Yes, I do.

3   Q.   How do you know?

4   A.   I can see that it's being displayed at the Central Library

5   on the floor where they have the archived items.

6   Q.   All right.

7        MS. O'LAUGHLIN:  Ms. Turner, if you will go to Page 8

8   of Exhibit 50.

9   Q   (By Ms. O'Laughlin) Do you recognize this?

10  A.   Yes, I do.

11  Q.   And what is it?

12  A.   It appears to be a hat that was provided through the City's

13  Wellness Center for the Heart Walk.

14       MS. O'LAUGHLIN:  Ms. Turner, if you could go to Page

15  12.

16  Q   (By Ms. O'Laughlin) Do you recognize this?

17  A.   Yes, I do.

18  Q.   What is this?

19  A.   That is a cap that is worn by the City of Dallas Water

20  Utilities employees.

21  Q.   All right.

22       MS. O'LAUGHLIN:  And, Ms. Turner, if you'll go to Page

23  13.

24  Q   (By Ms. O'Laughlin) Do you recognize this?

25  A.   Yes, I do.

1    Q.   What is this?

2    A.   It appears to be a T-shirt where the City of Dallas

3    sponsored the event.

4    Q.   And all three of these images we just looked at bear the

5    City's logo, correct?

6    A.   That's correct.

7    Q.   All right.  With respect to the images in Exhibit 50, were

8    they prepared in the ordinary skill for the City's business?

9    A.   Yes.

10    Q.   Is it the regular practice of the City to keep and maintain

11    records of the type shown in Exhibit 50?

12    A.   Yes.

13    Q.   Are the images in Exhibit 50 true and correct?

14    A.   Yes.

15         MS. O'LAUGHLIN:  We'd like to offer Exhibit 50.

16         MR. NORRED:  No objection, Your Honor.

17         THE COURT:  That's admitted into evidence.

18    Q    (By Ms. O'Laughlin) Has the City ever tried to determine how

19    many impressions of the City logo there have been?

20    A.   Yes.

21         MS. O'LAUGHLIN:  Ms. Turner, could you pull up

22    Exhibit 64?

23         THE COURT:  When -- When you ask that question, are you

24    talking about ones they have agreed to?

25         MS. O'LAUGHLIN:  We're talking about the views of the

```
 1    City logo, yes, Your Honor, which are all ones that the City has
 2    agreed to.
 3              THE COURT:  Okay.
 4              MS. O'LAUGHLIN:  The Defendant's marks are slightly
 5    different, although we contend confusing similar.
 6              THE COURT:  No, I get that.  I just want to know what
 7    your question means.
 8              MS. O'LAUGHLIN:  Yes.  We're asking about consumer
 9    impressions of the City of Dallas logo.
10              THE COURT:  Okay.
11    Q    (By Ms. O'Laughlin) Do you recognize Exhibit 64?
12    A.   I do.
13    Q.   What is it?
14    A.   It is a document showing the number of City of Dallas logo
15    impressions as of January 31st, 2022.
16              THE COURT:  Why in the world would some poor person be
17    given the assignment of counting that?
18              MS. O'LAUGHLIN:  Your Honor, it was created for the
19    TTAB proceeding below.
20              THE COURT:  I wasn't asking you.
21              MS. O'LAUGHLIN:  Oh.  Oh, sorry.
22              THE WITNESS:  We were asked by the City Attorneys, I
23    believe.  I don't ---
24              THE COURT:  To create this?  Mercy.  Okay.
25    Q    (By Ms. O'Laughlin) Do you see that there have been
```

 1   literally millions of commercial impressions of the City's logo

 2   as of 2022?

 3   A.   Yes.  It looks like, based off this document, you know, well

 4   over 13 million.

 5        THE COURT:  Where's the 13 million?  I'm looking at it.

 6   I don't see it.  There it is.  Okay.

 7   Q    (By Ms. O'Laughlin) Are you a resident of Dallas?

 8   A.   I am.

 9   Q.   How long have you lived in Dallas?

10   A.   I've lived in Dallas since 2008.

11   Q.   All right.  I'm not going to ask you about the times you see

12   the City's logo in connection with your job because you probably

13   encounter them more than most people.  But as a citizen going

14   about your daily life, how often do you see the City's logo?

15   A.   I would say I see it about 15 times a day.

16   Q.   All right.  What are some of the things that you see the

17   City's logo on as a citizen?

18   A.   Sure.  So when I'm leaving my house, I notice the logo on

19   the garbage bin and the recycle bin.  You know, as I'm driving

20   down the street, I notice it on all of the traffic signs.  I

21   notice the logo when I'm driving down my neighborhood park or

22   neighborhood library.

23   Q.   All right.  Do you know the rough population of the City of

24   Dallas?

25   A.   Yes.  I believe it's close to 1.3 million.

```
 1              MS. O'LAUGHLIN:  Ms. Turner, could you pull up

 2   Exhibit 82?

 3   Q    (By Ms. O'Laughlin) So does it appear from this exhibit that

 4   your estimate is quite close?

 5   A.   Yes.

 6   Q.   All right.  Do you know the rough population of Dallas

 7   County?

 8   A.   I'm unsure.  I'm assuming it's about double.

 9   Q.   All right.

10              MS. O'LAUGHLIN:  Ms. Turner, can you pull up

11   Exhibit 83?

12   Q    (By Ms. O'Laughlin) Do you see from this document that your

13   estimate appears to be quite close?

14   A.   Yes.

15   Q.   All right.  Has the City filed an application to obtain a

16   Federal Trademark Registration for the City's logo?

17   A.   Yes.

18              MS. O'LAUGHLIN:  Ms. Turner, can you pull up

19   Exhibit 79?

20   Q    (By Ms. O'Laughlin) Have you seen this exhibit before?

21   A.   Yes.

22   Q.   Do you recognize this as an application for the City's logo

23   with the Trademark Office to obtain a Certificate of

24   Registration?

25   A.   Yes, I do.
```

```
1    Q.   Okay.  Are you aware that the Trademark Office issued a

2    rejection of the City's application to the extent it sought to

3    register clothing and headwear?

4    A.   Yes, I am.

5    Q.   Are you aware that the Trademark Office based their

6    rejection on the registrations for the Ghost Logo and the Tilted

7    Star Logo that the Defendant is the registrant for?

8    A.   Yes.

9    Q.   Are you aware that other Government -- Excuse me.

10            THE COURT:  Is that the TTAB ruling?

11            MS. O'LAUGHLIN:  This is not the TTAB ruling.  This is

12   the City's trademark application on the Office Action --

13            THE COURT:  Okay.

14            MS. O'LAUGHLIN:  -- it received rejecting the

15   application in part based on the registrations that the Defendant

16   is the registrant for.

17            THE COURT:  Okay.  Okay.

18   Q    (By Ms. O'Laughlin) Are you aware of other governmental

19   entities that have registered trademarks claiming apparel?

20   A.   Yes.

21   Q.   Are there any examples that come to mind?

22   A.   Yes.  The State of New York.

23            MR. NORRED:  Objection, Your Honor; foundation.  She's

24   not presented as an expert for trademark.

25            THE COURT:  Overruled.
```

```
1   Q    (By Ms. O'Laughlin) You may continue your answer of what

2   government registrations you're aware of.

3   A.   Sure.  The State of New York, the City of New York, the

4   State of Texas.

5   Q.   Have you ever seen apparel bearing the "I (heart) New York"

6   mark?

7   A.   Yes, I have.

8           MS. O'LAUGHLIN:  Ms. Turner, could you pull up

9   Exhibit 70?

10  Q    (By Ms. O'Laughlin) Do you recognize the mark depicted in

11  this Certificate of Registration?

12  A.   I do.

13  Q.   Can you read the name of the owner of the registration?

14  A.   The New York State Department of Economic Development,

15  New York Corporation.

16  Q.   Can you read the goods listed on the registration?

17  A.   Yes.  For T-shirts, gloves, hats, jackets, sport shirts,

18  sweaters, scarves, sweatshirts, and shoes in Class 25.

19          MS. O'LAUGHLIN:  Ms. Turner, could you pull up Exhibit

20  71?

21  Q    (By Ms. O'Laughlin) Do you recognize the mark depicted in

22  this registration?

23  A.   Yes, I do.

24  Q.   And what's the -- Can you read the name of the owner of this

25  registration?
```

1    A.   Yes.  It's the New York City Fire Department.

2    Q.   And can you read the goods listed on the registration?

3    A.   Yes.  For clothing; namely T-shirts, sweatshirts, hats,

4    caps, baseball caps, jackets, shirts, headwear, warm-up suits and

5    wind-resistant jackets, pants and shirts in Class 25.

6              MR. NORRED:  Objection, Your Honor.  This is irrelevant

7    and it's beyond her scope.  She's using the witness to provide

8    legal analysis.  If deposing counsel wants to make an argument

9    based on these trademarks, that's different.  The witness

10   shouldn't be used in this fashion.

11             THE COURT:  What's your objection?

12             MR. NORRED:  Relevance and the scope.

13             THE COURT:  Overruled.

14             MR. NORRED:  Thank you.

15             THE COURT:  Go ahead.

16             MS. O'LAUGHLIN:  All right.  Ms. Turner, could you go

17   to Page 4?

18   Q    (By Ms. O'Laughlin) Do you recognize the mark depicted in

19   this Certificate of Registration?

20   A.   Yes, I do.

21   Q.   Can you read the name of the owner of the registration?

22   A.   The City of New York.

23   Q.   Can you read the goods listed on the registration that

24   Ms. Turner is going to hover over?

25   A.   Yes.  For clothing; namely, caps, T-shirts and sweatshirts

 1    in Class 25.

 2    Q.    Have you personally seen items of apparel bearing the "NYPD"

 3    mark?

 4    A.    Yes, I have.

 5    Q.    Have you personally seen items of apparel bearing the "FDNY"

 6    mark?

 7    A.    Yes.

 8    Q.    Have you personally seen items of apparel bearing the "I

 9    (heart) New York" mark?

10    A.    Yes.

11          MS. O'LAUGHLIN:  At this time, Your Honor, we would

12    like to offer Exhibits 70 and 71.

13          MR. NORRED:  Your Honor, I'm going to ---

14          THE COURT:  Same objection?

15          MR. NORRED:  Yes, Your Honor.

16          THE COURT:  Overruled.

17          MS. O'LAUGHLIN:  Ms. Turner, can you pull up Exhibit

18    72?

19          THE COURT:  Okay.

20    Q    (By Ms. O'Laughlin) Do you recognize the mark ---

21          THE COURT:  All right, stop.

22          MS. O'LAUGHLIN:  Yes.

23          THE COURT:  If you didn't get your registration, what

24    difference does all of this make?

25          MS. O'LAUGHLIN:  Your Honor, one of the arguments

1    Defendant has made is that T-shirts for others is not in the

2    natural zone of expansion for a city, and this evidence shows

3    that consumers are likely to associate governmental marks with

4    the Government.

5            THE COURT:  Okay.  But you didn't get yours.

6            MS. O'LAUGHLIN:  Your Honor, we actually do have a

7    registration for certain services.  The one that has been delayed

8    and is still pending has been rejected based on Defendant's

9    registrations.  So if the Defendant's registrations are canceled,

10   then our -- most likely our registration would be approved.

11           THE COURT:  Okay.  Rather than go through all of this,

12   I assume you're going to show me this and several more of these,

13   and you're going to have the same objections with regard to all

14   of those.  Offer all of those.

15           I'm going to overrule your objections to all of that,

16   and then I'll make a ruling at the appropriate time of -- of

17   that.

18           So what all are you going to offer besides Texas

19   and ---

20           MS. O'LAUGHLIN:  This is our last one, Your Honor.

21           THE COURT:  Okay.  You're offering that.

22           MS. O'LAUGHLIN:  So we offer Exhibit -- Excuse me.

23           THE COURT:  I know what that looks like.  I live in

24   Texas and have for 73 years.  So, yes, I've seen it often in ads

25   and that sort of thing.

```
 1              And you make the same objection with regard to this
 2   being admitted because of relevance and I forgot the other.
 3              MR. NORRED:  Well, it's ---
 4              THE COURT:  And it's beyond her scope.
 5              MR. NORRED:  Beyond her scope.
 6              THE COURT:  Okay.  All right.  Overrule that.
 7              This is admitted into evidence, and it's exhibit
 8   number?
 9              MS. O'LAUGHLIN:  It's 72, Your Honor.
10              THE COURT:  72 is admitted into evidence.  Okay.  All
11   right.  I understand.  That means when I say that, don't spend
12   any more time on that.  Go to something else.
13   Q    (By Ms. O'Laughlin) Ms. Fast, have you ever gone into a
14   restaurant and seen the restaurant selling T-shirts?
15   A.   Yes, I have.
16   Q.   If you saw a person walking down the street wearing a
17   T-shirt with the logo of a restaurant that you're familiar with,
18   would you assume that restaurant had sponsored that T-shirt?
19   A.   Yes.
20   Q.   Okay.  Why ---
21              THE COURT:  Just like in Mama's Daughters, and they all
22   wear those shirts that say "Momma says X, Y and Z"?
23              MS. O'LAUGHLIN:  It's been so long since I've been in
24   Mama's Daughters.
25              THE COURT:  Well, you should have gone this morning.
```

```
 1   You would have found me.

 2            MS. O'LAUGHLIN:  Okay.  Well, maybe tomorrow you'll be

 3   back and we might try that.

 4            THE COURT:  All right.

 5            MS. O'LAUGHLIN:  Yes.  I -- I know -- I buy Chuy's

 6   T-shirts for my nephew, so.

 7            THE COURT:  Okay.

 8   Q    (By Ms. O'Laughlin) Why is it important to the City to

 9   ensure that consumers are not confused that the City might have

10   authorized the Defendant's use of the Tilted Star Logo?

11   A.   It's very important for our brand, our image and our

12   reputation.  You know, the City of Dallas, we provide services to

13   -- to the City, you know, whether you're a resident, a visitor or

14   a tourist.  And our job for many of the employees is primarily

15   being out in the community and visible.  That logo represents

16   that you are an employee of the City of Dallas and represent our

17   image as well as gaining trust from the community.

18   Q.   All right.

19            MS. O'LAUGHLIN:  Ms. Turner, can you pull up

20   Exhibit 23?

21   Q    (By Ms. O'Laughlin) Could you, please, read the highlighted

22   sentence on Exhibit 23?

23   A.   "In 2011 Triple D Gear, LLC, was granted the full legal

24   trademark for the brand mark by the City of Dallas and the

25   United States Supreme Court."
```

1    Q.    When you read this, what did it mean to you?

2    A.    It means that the City of Dallas sponsored or allowed Triple

3    D Gear to use the logo.

4    Q.    And did the City ever authorize Triple D Gear to use the

5    logo?

6    A.    No.

7    Q.    All right.

8              MS. O'LAUGHLIN:  No further questions.

9                        CROSS EXAMINATION

10    QUESTIONS BY MR. NORRED:

11    Q.    Good morning, Ms. Fast.

12    A.    Good morning.

13              THE COURT:  Go ahead, Mr. Norred.

14    Q    (By Mr. Norred) Ms. Fast, the Turkey Trot T-shirt that we

15    saw a few minutes ago, it didn't specify any service at all, did

16    it?

17    A.    Not that I'm aware of.

18    Q.    Okay.  And then did the 92.5 radio station -- We all know

19    it's a radio station, right, or at the time?

20    A.    I'm not familiar with the radio station.

21    Q.    There were dozens of logos on the back of that shirt, right?

22    A.    That's correct.

23    Q.    Were they all demonstrating T-shirts for others?

24    A.    Can you repeat or can you rephrase the question?  I'm sorry.

25    Q.    Do you think that all of those organizations could -- could

 1    then go get a trademark for T-shirts for others?

 2    A.    I'm assuming so, yes.

 3    Q.    And you base that on what?

 4    A.    That's their -- the logo that they're using to represent

 5    themselves or their company.

 6    Q.    But you can't tell what any of those organizations do unless

 7    you happen to already know, right?

 8    A.    That's correct.

 9    Q.    Or any service that they're offering.

10    A.    Correct.

11    Q.    So just an ornamental use of the logo on a shirt, right?

12    A.    I see it as a sponsorship, not an ornamental use.

13    Q.    Okay.  And going to all of these state and city trademarks

14    that we just talked about, you don't know what the trademark

15    history of any of those trademarks are, do you?

16    A.    No, I don't.

17    Q.    You don't know if anybody developed a clothing brand with

18    New York City and received a trademark for that use before

19    New York was -- attempted to get a trademark for it, do you?

20    A.    I don't know the history of their trademark.

21            MR. NORRED:  No further questions.

22            THE COURT:  Thanks, Mr. Norred.

23            Anything else?

24            MS. O'LAUGHLIN:  Just one question.

25

```
1                         REDIRECT EXAMINATION

2   QUESTIONS BY MS. O'LAUGHLIN:

3   Q.   When you saw all the logos on the back of the Turkey Trot

4   T-shirt, did you assume all of those entities sponsored that

5   race?

6   A.   Yes, I did.

7            MS. O'LAUGHLIN:  No further questions.

8            THE COURT:  Okay.  Let's make sure I got this clear.

9   When did the City start using this trademark?

10           I'm not asking you.  I'm asking her.

11           MS. O'LAUGHLIN:  Okay.

12           THE WITNESS:  It was in August of 1972.

13           THE COURT:  And do you know when -- when Defendant

14  started using it or do you have any information about that?

15           THE WITNESS:  I personally became aware throughout

16  the -- the legal matter.

17           THE COURT:  Okay.

18           THE WITNESS:  But I don't know the exact year.

19           THE COURT:  Was it before or after the City was using

20  that mark?

21           THE WITNESS:  It was after.

22           THE COURT:  Long after?  Near after?

23           THE WITNESS:  Long after.  It's my understanding that

24  Triple D Gear was using the logo, you know, I think within the

25  past ten years.
```

1          THE COURT:  Okay.  All right.  Do you have any

2    questions based on my questions, Mr. Norred?

3          MR. NORRED:  No, Your Honor.

4          THE COURT:  Okay.  Can she step down?

5          MS. O'LAUGHLIN:  Yes, Your Honor.

6          THE COURT:  Be excused?

7          All right.  Thank you, all.  You may step down.

8          All right.  Call your next witness.

9          MS. O'LAUGHLIN:  At this time we would like to play the

10   videotaped deposition of Mr. Sanchez.

11         THE COURT:  Is he going to testify?

12         MS. O'LAUGHLIN:  He is but his testimony in his

13   deposition is quite important to lay the foundation for the

14   questions.

15         THE COURT:  Well, you can't do both.  You're either

16   going to depose him and use it or you're going to question him

17   and you can ask him questions from that.  That's fine, but I'm

18   not going to sit here and hear both.  That's not appropriate.

19         So which one do you want to use?  I mean why don't you

20   just call him and ask him questions about it?  How long is his

21   deposition?

22         MS. O'LAUGHLIN:  The videotape is roughly an hour and

23   14 minutes.

24         THE COURT:  But -- Okay.  So you're not going to call

25   him to testify?

1          MS. O'LAUGHLIN:  We will not call him, but we reserve

2    the right to cross-examine him when Defendant calls him.

3          THE COURT:  Are you -- You're going to call him, I'm

4    assuming, Mr. Norred.

5          MR. NORRED:  It's -- Your Honor, it's their burden.  If

6    they -- If I -- If it gets to my turn, ---

7          THE COURT:  Maybe you will, maybe you won't.

8          MR. NORRED:  That's correct.

9          THE COURT:  I didn't mean to make you have to put on

10   evidence if you don't want to put on evidence.  That's your

11   business.

12         MR. NORRED:  At this point I cannot say.  I was

13   anticipating such but I cannot say.

14         THE COURT:  Okay.  All right.  It's an hour and how

15   long?

16         MS. O'LAUGHLIN:  It's an hour and 14 minutes.

17         THE COURT:  Okay.  Let's take a break so I can get this

18   working, my computer working up here that's not hooked up.

19         All right.  It will be about -- This will be just

20   about, as long as they can get this hooked up, five or ten

21   minutes and then we'll start that.

22         Are you running it?

23         MS. TURNER:  Yes.

24         THE COURT:  Are you sure it works?

25         MS. TURNER:  Yes, Your Honor.

1          (Court recessed from 10:04 AM until 10:16 AM.)

2          THE COURT:  Okay.  Here we go, movie time.  Let's turn

3   the mood lights down, Ronnie.

4          (Videotaped deposition of ARTURO SANCHEZ played in open

5   court from 10:16 AM until 11:30 AM.)

6          THE COURT:  Okay.  You can turn the lights on, Ronnie.

7   Thank you.

8          Okay.  Call your ---

9          MS. O'LAUGHLIN:  Your Honor, just to clarify, all of

10  the exhibits that the Defendant testified ---

11         THE COURT:  You're offering all of those exhibits that

12  you made reference to in there?

13         MS. O'LAUGHLIN:  Yes, Your Honor.

14         MR. NORRED:  No objection, Your Honor.

15         THE COURT:  All right.  They're all admitted into

16  evidence.

17         MS. O'LAUGHLIN:  At this point we would like to read

18  the TTAB deposition testimony as we were not allowed to videotape

19  the TTAB deposition testimony.

20         THE COURT:  You weren't?  Why?

21         MS. O'LAUGHLIN:  The TTAB prohibits video depositions.

22         THE COURT:  Okay.  How long is that?

23         MS. O'LAUGHLIN:  It's fairly short, Your Honor.

24         THE COURT:  I didn't ask that.

25         MS. O'LAUGHLIN:  I believe it's less than half an hour.

47

1          THE COURT:  How many of these are we going to have?

2     You told me this was your last witness.  It wasn't your last

3     witness.  You got this and how many more?

4          MS. O'LAUGHLIN:  This is the last deposition testimony

5     that we're introducing at this time.

6          THE COURT:  Okay.  You got any live witnesses after

7     that?

8          MS. O'LAUGHLIN:  No.

9          THE COURT:  So this is it?

10         MS. O'LAUGHLIN:  Yes.

11         THE COURT:  Okay.  Why -- Why are we playing this?

12         MS. O'LAUGHLIN:  Well, we can't play it, Your Honor,

13    but we're reading it.

14         THE COURT:  Whatever, reading it.

15         MS. O'LAUGHLIN:  It goes to the Defendant's

16    inconsistent testimony about his use and designs on the logos.

17         THE COURT:  Who are you going to use as your guinea pig

18    that's going to get up here on the witness stand?

19         MS. O'LAUGHLIN:  My colleague, Mr. Tower, is going to

20    read Mr. Sanchez's answers, and Ms. Turner is going to read the

21    questions that she asked during that questioning.

22         THE COURT:  Okay.  Can't I just read that myself?

23         MS. O'LAUGHLIN:  If Your Honor would prefer to read it

24    yourself, ---

25         THE COURT:  I would prefer.

1          MS. O'LAUGHLIN:  Then we will allow Your Honor to read

2     it yourself.

3          THE COURT:  Do you have any objection to that to save

4     some time, Mr. Norred?

5          MR. NORRED:  I think that's an excellent idea,

6     Your Honor.

7          THE COURT:  Okay.  Now it's not that I don't want to

8     hear this wonderful gentleman.  I'm sure he's got a wonderful

9     voice and I could hear his inflections and enjoy him being up

10    here.  It would be great.  I don't want to note no reflection on

11    him or Ms. Turner or anything like that.  It's just I read pretty

12    fast and a lot faster than y'all can talk and -- unless you all

13    are super fast talkers, and I doubt it.  You're lawyers.  I've

14    never met one -- I've never meant one that was a very fast

15    talker.

16         Okay, great.  So you're offering that.  Mr. Norred

17    agrees.  I will view that and will read it.  And depending upon

18    how necessary it is for my rulings, I will let you know that.

19    Okay.  So that's admitted.  That only took about a minute to get

20    that done.

21         Okay.  So where are you in your -- You rest?

22         MS. O'LAUGHLIN:  The City rests.

23         THE COURT:  Mr. Norred?

24         MR. NORRED:  I call Arturo Sanchez, Your Honor.

25         THE COURT:  Mr. Sanchez?

1              Good morning, Mr. Sanchez.

2              THE WITNESS:  Good morning, Your Honor.

3              THE COURT:  That's a beautiful tie, by the way.

4              THE WITNESS:  Well, thank you.  It was a Father's Day

5    gift.

6              THE COURT:  Oh, good.  Well, good.

7              All right.  Let me get you sworn in.  Okay?

8              THE WITNESS:  Yes, sir.

9              COURTROOM DEPUTY:  Do you solemnly swear to tell the

10   truth, the whole truth, and nothing but the truth, so help you

11   God?

12             THE WITNESS:  The whole truth.

13             THE COURT:  Okay.  Mr. Norred?

14                        DIRECT EXAMINATION

15   QUESTIONS BY MR. NORRED:

16   Q.   Mr. Sanchez, is it okay if I call you "Arturo"?

17   A.   Yes, sir.

18   Q.   Okay.  We're going to hop, skip and jump, just hit the ones

19   that are important.

20        When you say Sir Lynch created the digital files, what do

21   you mean?

22   A.   He was my graphic designer.

23   Q.   Did he do any artistry to it?

24   A.   With directions of mine, but he used the mouse and ---

25             THE COURT:  Are you saying "art history" or "artistry"?

```
 1              MR. NORRED:  Artistry.

 2              THE COURT:  Okay, sorry.

 3    Q    (By Mr. Norred) So he was a mechanic -- I don't want to put

 4    words in your mouth and testify for you, but he was your

 5    mechanic?

 6    A.   You can call him a mechanic, yes, sir.

 7    Q.   Did you design these logos?

 8    A.   Yes, sir.

 9    Q.   When did you design and create the Ghost Logo?

10    A.   In the circa before the Tilted Star Logo.

11    Q.   Okay.  So you understand there have been various statements

12    you've made.

13    A.   Correct.

14    Q.   So after refreshing for the last two years, give the Court

15    your best -- your best idea of when you created the Ghost Logo.

16    A.   The Ghost Logo was first and then we created the Tilted Star

17    Logo.

18    Q.   Okay.  Now you've been very consistent in all the testimony

19    saying the Tilted -- the Ghost Logo was first.  Why do you say

20    that?  Why are you so sure about that?

21    A.   Because when we were creating the cultural Triple D culture,

22    we were designing a design for the Triple D culture, and that was

23    the first design that we did.

24    Q.   But you filed the application for the Tilted Star first.

25    A.   Correct.
```

1  Q.   Okay.  Were you using the Ghost Logo commercially at that

2  time?

3  A.   Yes, sir.

4  Q.   And so what were you using the Ghost Logo for?

5  A.   Toward merchandise for ---

6          THE COURT:  Okay.  I'm going to stop for something.

7          I didn't notice this.  When you were sworn in, you

8  didn't answer "yes" or "no."  You just said, "The whole truth."

9  Answer either an affirmative "yes" or "no."  You take the oath?

10         THE WITNESS:  Yes, sir.  Yes, Your Honor.

11         THE COURT:  You do take the oath.  I'm not giving you a

12 hard time.  I'm just saying we didn't get the record correct.

13 Okay?

14         THE WITNESS:  Yes, Your Honor.

15         THE COURT:  Okay.  Go ahead.

16         MR. NORRED:  Okay.

17 Q   (By Mr. Norred) So when were you using the Ghost Logo

18 commercially?

19 A.   During our recording independent merch.

20 Q.   Is there a delineation between when you used the Tilted Star

21 versus the Ghost?

22 A.   Definition of "delineation."

23 Q.   Was there -- Did you always use the Tilted Star except for

24 certain times?  Then you used the Ghost Logo?  Was there a

25 separate difference?

1    A.    Yes, it was a difference.  The difference was since we --

2    When we first started using the Triple D Ghost Logo, that was our

3    first logo that we created.  And as we created the Tilted Star

4    Logo, that was the lot cooler kind of like logo.  So we started

5    using that as our primary logo, but we would use the Ghost Logo

6    as capsules at times when we would drop different things.

7    Q.    Explain to the Court the "capsules."  What do you mean by

8    that?

9    A.    Capsules are basically seasonal things that -- that you do

10   in an apparel industry to drop different types of designs or

11   different type of apparel in different seasons.

12   Q.    Do you maintain apparel for sale all the time using the

13   Ghost Logo?

14   A.    Yes.  They would -- In capsules.

15   Q.    Okay.  So in capsules, meaning limited times.

16   A.    Correct.

17   Q.    Okay.  Give me an example of a capsule.

18   A.    Halloween.  So Halloween, we would do the Ghost Logo as a

19   Halloween theme for our capsule.

20   Q.    And what would a run of those shirts or caps be?

21   A.    A "derun"?

22   Q.    Yeah.  Would it be a hundred or a thousand of these or how

23   many would you sell?

24   A.    It depends.  Sometimes it's a -- it's a hit and run.

25   Sometimes it's a, you know, dud.  So I mean it just depends on

1   what -- you know, what season it was, what worked and what didn't

2   work.

3   Q.   Okay.

4        THE COURT:  What would you start off with before you

5   knew it was going to be a hit or a dud?

6        THE WITNESS:  What would we start off with, Your Honor?

7        THE COURT:  500?  100?

8        THE WITNESS:  Oh, no.  We would start off with 250.

9        THE COURT:  Okay.  Okay.  Go ahead.

10  Q    (By Mr. Norred) So what would you -- would a big hit be?

11  A.   A big hit was -- One of our big hits was the "glow in the

12  dark."

13  Q.   Tell us about that.  The "glow in the dark" was when?

14  A.   During the Halloween season.

15  Q.   Any particular Halloween?

16  A.   I guess one of our first Halloweens that we did it at the

17  beginning of our Triple D Gear timing when we created it.

18  Q.   Prior to 2010?  After 2010?

19  A.   After 2010 whenever we did the actual Ghost Logo thing where

20  it glew in the dark.

21  Q.   Okay.

22  A.   It was kind of a hit.

23  Q.   And how much -- And how many of those did you sell?

24  A.   The first run was limited.  Then we re-upped and we did a

25  good 500 pieces or more.

1    Q.    Okay.  Let's go back in time.  How did you meet

2    Ahmed Youssef?

3    A.    I met Ahmed Youssef at a friend's house at a Super Bowl

4    party back in 2000 -- maybe '7.  No, it was -- Yeah, about '7.

5    Q.    And how did you wind up in business together?

6    A.    He ended up -- I built a studio, and he ended up coming in

7    and liking it, and he wanted to be a Creative Director in the

8    A & R.

9    Q.    So what was your relationship with him business-wise?  Was

10   he -- This was for Rich Mind Records, right?

11   A.    Correct, Rich Mind Records.

12   Q.    So what was his position with Rich Mind Records?

13   A.    A Creative Director in A & R.

14   Q.    And what's "A & R"?

15             THE COURT:  What is "A & R"?

16             THE WITNESS:  Artist Development.

17             THE COURT:  Okay.

18   Q    (By Mr. Norred) So what was his daily job title?  What did

19   he do as far as duties?

20   A.    He would help create music.  He would help create ideas.  He

21   would help create, you know, different things of what we can and

22   can't do on flyers and stuff like that.

23   Q.    And was he a contractor?  Being paid as a contractor?

24   A.    He was an employee.

25   Q.    Employee, okay.  So how did that transfer over to Triple D

1    Gear?

2    A.    Well, whenever we -- There was a fire at my studio about

3    2011 and there was a pandemic in the music industry where digital

4    sales were going up and CDs were going out of style.  Tapes and

5    CDs were going out of style.  We looked at the music industry and

6    it kind of had a shift.  So out of the whole staff, I felt as if

7    Ahmed Youssef was the best employee that I could team up with to

8    go into business with, and we created Triple D Gear.

9    Q.    Okay.  And so how did he wind up being the only member

10   listed on the -- on the LLC documentation?

11   A.    Well, he went and hired -- We both agreed to hire

12   David Small, but he had more communication with David Small.  And

13   as things went forward and everything kind of worked out,

14   apparently there was some miscommunication of how Mr. Small, you

15   know, moved forward with filing things.

16   Q.    And how did you find out that that was wrong?

17   A.    Like I said on the -- on my deposition, whenever I was able

18   to actually look at the paperwork, it was like, "Wow!"

19   Q.    Okay.  So that was -- In your deposition, if I heard it

20   right, you were talking about the application for the -- for the

21   registration of the Tilted Star, though; right?

22   A.    Correct.

23   Q.    Okay.  So that was one problem you had with Youssef.

24   A.    Correct.

25   Q.    The other one was the LLC documentation.

1    A.   Correct.

2    Q.   So when did you find out about that?

3         THE COURT:  Yeah.  I want to know some dates here.  Tie

4    that up.

5    A.   So what -- Recall the question again.

6    Q    (By Mr. Norred) So you found out that the trademark was

7    wrong when you got the e-mail from -- from David Smalls, right?

8    Small.

9    A.   Correct.

10   Q.   And ---

11        THE COURT:  Who is that?

12        THE WITNESS:  When the registration came in, our

13   trademark registration came in.

14        THE COURT:  Okay.  When?  When was that?

15        THE WITNESS:  Oh, 2014.

16        MR. NORRED:  I've got an e-mail.

17        THE COURT:  Okay.  That's close enough.

18        MR. NORRED:  Okay.

19   Q    (By Mr. Norred) So once you found out that he had put his

20   name on there and you fired Mr. Small, how did you resolve the

21   trademark?

22   A.   We hired another attorney.

23   Q.   And -- And how did that attorney resolve the trademark

24   ownership?

25   A.   He transitioned it to Triple D Gear.

1    Q.   What I'm showing the Court is Plaintiff's Exhibit 32.   Do

2    you recall this trademark assignment?

3    A.   Correct.

4    Q.   Okay.   So -- And this has been admitted already by

5    agreement.   And this is in September of 2014.   Is that right?

6             THE COURT:   Are you sure it's in?   It's admitted by

7    agreement?   We already admitted all these?

8             MS. O'LAUGHLIN:   Your Honor, we submitted a Joint

9    Exhibit List that allowed for pre-admission of all the exhibits

10   listed on that.

11            THE COURT:   Okay.   And y'all both agreed to that and

12   all that pre-admission.

13            MS. O'LAUGHLIN:   Yes, Your Honor.

14            THE COURT:   Okay.   Then I admit all those.

15            Okay.   Go ahead.

16            Who is this lawyer?

17            MR. NORRED:   Say that again?

18            THE COURT:   Who is this lawyer that did this?

19            THE WITNESS:   Skip.   R-D -- I can't pronounce his last

20   name, Your Honor.   Skip Rudsenske is, I think, the -- I

21   believe ---

22            MR. NORRED:   That's about four before me, so.

23   Q    (By Mr. Norred) All right.   So ---

24            THE COURT:   We don't know who the name of his lawyer

25   is?

58

1          MR. NORRED:  At -- At this point I don't.

2     Q    (By Mr. Norred) You're saying it was "Skip"?

3     A.   I call him "Skip" but his last name is pretty ---

4          MR. NORRED:  I can find the name, but I don't know who

5     the attorney was for this.

6          THE COURT:  Okay.

7          MR. NORRED:  David Small handled the beginning and then

8     there were two or three others.

9          THE COURT:  I get David Small.

10         MR. NORRED:  But -- And then we'll go through a number

11    of them.

12         THE COURT:  All right.  So we don't have a check with

13    his name on it?  I'm assuming he had to pay him something.

14         MR. NORRED:  I have it, Your Honor.  I just don't have

15    it right here.

16    Q    (By Mr. Norred) So -- So did you pay Youssef anything for

17    this?

18    A.   No, sir.

19    Q.   He just voluntarily said, "My bad.  Here's your assignment"?

20    A.   Correct.

21    Q.   Okay.  Who else was on the Rich Mind Records team?

22    A.   I had a whole staff.  It was Michkel Cain, Carla Gills.

23    Q.   Stop.  Michkel Cain, where else have we heard that name in

24    this -- in these proceedings?

25    A.   Where he put his name on the flyer.

1  Q.   So that was Christopher ---

2  A.   Michkel Cain.  It was Michkel Christopher Cain is his full

3  name.

4  Q.   So Christopher Cain, what was his duties?  What was his

5  task?

6  A.   To -- To help the duties of Rich Mind Records, to help make

7  sure the albums were done, the recordings were recorded; the

8  daily duties.

9  Q.   Okay.  And so did he do anything with any of these logos

10 that was independent of Rich Mind Records?

11 A.   No, sir.

12 Q.   Okay.  But you said that there was an issue at one point

13 with Mr. Cain.  What happened there?

14 A.   I mean he felt as if he -- In the -- In the music industry,

15 everybody wants to make a name for themselves.  So he started

16 putting his name on a lot of our product or a lot of our graphic

17 designs and flyers.  That -- It was kind of odd to me about why

18 he was doing it and especially with our, you know, albums and our

19 merch.

20 Q.   And so what did you -- How did you wind up eliminating the

21 Christopher Cain dispute?  Was there an actual dispute?

22 A.   I mean it wasn't a dispute.  It was more -- You know, it was

23 more of "why," and he was just trying to make a name for himself

24 because he wanted to start his own clothing line which was bow

25 ties from what he told me.

60

1    Q.    Okay.  So when you found out that Youssef had filed the

2    application in his own name and then you found out that he had

3    filed the LLC in his own name, how did that impact the

4    relationship?

5    A.    It -- It took a left to our relationship because I trusted

6    him with that.

7    Q.    Okay.  And did you -- How did you wind up ending that

8    relationship?

9    A.    By ending up buying him out, his portion of the company.

10   Q.    Okay.

11           THE COURT:  What did that cost you?

12           THE WITNESS:  25K.

13           THE COURT:  Okay.

14   Q    (By Mr. Norred) And there's also a discussion of Sir Lynch.

15   Tell us about the relationship with Sir Lynch.

16   A.    Sir Lynch was a graphic designer.  He was a very smart kid

17   at the time and, you know, he was very good with graphics with

18   Adobe Photo Shop.  And, you know, unfortunately, as time

19   progressed, drugs got the best of him, and he was just, you know,

20   in and out of shelters, you know, and just trying to live.

21   Q.    Okay.  And so how did you -- I put up what is -- we've got

22   as -- I think this is Plaintiff's 22.  This is the agreement that

23   parted ways?

24   A.    Excuse me?

25   Q.    So what was this?  Tell us about this agreement.  How did

1    this come about?

2    A.    This agreement came about because he kept threatening me

3    verbally over the phone and by e-mail of how he owned all of my

4    Rich Mind Records graphics, how he owned all this, you know, the

5    things that he did for Rich Mind Records.

6              THE COURT:  And you bought him out for a grand, right?

7    Right?

8              THE WITNESS:  Yes, sir.

9              THE COURT:  Okay.

10   Q    (By Mr. Norred) Okay.

11             THE WITNESS:  Yes, Your Honor.

12   Q    (By Mr. Norred) Now we've got in the record already, and

13   I'll just refer to it, Exhibit 28.  This is -- Defendant's 28 is

14   the first Tilted Star docket, the whole application.

15             29 is the Ghost Logo, whole application and the whole

16   docket, everything that the USPTO has.

17             And Exhibit 30 is the second Tilted Star docket.

18             Aside from the -- from the ownership with Exhibit 28

19   and the first Tilted Star docket, is everything else in there

20   correct?

21   A.    Rephrase that.

22   Q.    In the application.  They're specimens, right?

23   A.    All the specimens is correct.

24   Q.    All the specimens are correct, okay.

25             Explain to us and the Court the statement about the City of

 1    Dallas and the Supreme Court authorizing its logo.

 2    A.    It was a media -- It was like a PR lady that was -- just

 3    graduated from college that was trying to work with us and just

 4    wrote up a bio.  And at that time, once we won the hearing from

 5    the city state judge locally and was granted our trademark, then

 6    we, you know, had a PR lady that just -- almost like an intern at

 7    the time to write up a bio for our website.

 8    Q.    And how long was that up like that?

 9    A.    You know, it was up for a while.  I had my, you know, people

10    who worked for me that worked the website; that I didn't even

11    look at it and just didn't realize it was up and the way it was

12    worded.

13    Q.    And what did you mean by approved by the Supreme Court and

14    the City of Dallas?

15    A.    We didn't -- I didn't mean nothing.  It's just the way she

16    wrote it, and it was just miswritten.

17    Q.    Well, was there any basis for why she did that?

18    A.    Well, we explained to her that we had just got -- we won the

19    ruling from our city judge locally.

20    Q.    So she's referring to the District Court ruling?

21    A.    Correct.

22    Q.    Okay.

23            THE COURT:  Some state district court?  She made the

24    equivalent of Chief Justice Robertson, the nine sitting on Mount

25    Olympus up there in Washington.  That was untrue, correct?

63

```
 1                    THE WITNESS:  Yes.  Yes, Your Honor.

 2                    THE COURT:  But it's just not true.

 3                    THE WITNESS:  It's not true.

 4                    THE COURT:  Okay.  Go ahead.

 5   Q    (By Mr. Norred) There was one other dispute that's been

 6   discussed as challenging the ownership.  Who is "Jesus Remedios

 7   Manqueros"?

 8   A.   He is an individual that Michkel Cain ended up convincing

 9   that he owned the -- our apparel from Rich Mind Records and

10   convinced him to invest into the company or to get -- convinced

11   him to get into the company but ended up pocketing the money

12   without telling nobody.

13   Q.   Okay.

14                    THE COURT:  Do what now?  I'm not sure I get that.

15                    MR. NORRED:  This is a good story.

16   Q    (By Mr. Norred) So tell ---

17                    THE COURT:  Well, I don't want the whole story.  What

18   did you mean by hocked something or something?

19                    THE WITNESS:  Well, he portrayed -- he portrayed to

20   this fellow that he owned ---

21                    THE COURT:  Oh.  He sold something that he didn't have.

22   And then to straighten all that out, you got rid of him for three

23   grand.

24                    THE WITNESS:  Correct, sir, Your Honor.

25                    THE COURT:  Okay.  Did you ever have anybody that
```

```
 1   didn't rip you off or whatever?
 2            THE WITNESS:  It's been -- Everybody -- Your Honor,
 3   everybody's been fighting me, and now the City of Dallas is on
 4   top of me.
 5            THE COURT:  Well now, the City of Dallas is taking it
 6   pretty -- I mean they're not trying to rip you like these people
 7   are ripping.  They're not -- As far as I know, none of these
 8   ladies have gone to drug rehab and they haven't portrayed
 9   something other than they've always taken the same position.
10   It's a little different.  Would you agree?
11            They didn't come to work with you in the music apparel
12   or any of this business.  I'm talking about something different.
13   The City of Dallas has been fighting you straight up the whole
14   time, correct?
15            THE WITNESS:  Yes, Your Honor.
16            THE COURT:  I don't mean you agree with them.  They've
17   just been fighting you, correct?
18            THE WITNESS:  Yes, Your Honor, using tax dollars to
19   fight.
20            THE COURT:  All right.  How many more of these people
21   are you going to have that he's had to deal with that are ---
22            MR. NORRED:  That's it, Your Honor.
23            THE COURT:  Okay.
24            MR. NORRED:  With the affirmation of the three dockets
25   and the evidence that's therein, that's all I have, Your Honor.
```

```
1              THE COURT:  All right.

2              MR. NORRED:  I pass the witness.

3              THE COURT:  Cross?  How long is your cross going to be?

4   An estimate.

5              MS. O'LAUGHLIN:  I believe it will be less than 30

6   minutes.

7              THE COURT:  Okay.

8              MS. O'LAUGHLIN:  But it will depend on Mr. Sanchez's

9   answers.

10             THE COURT:  I've got to break.  I'm sorry.  Before we

11  had this trial set, I have a meeting at 12:30 well north of here,

12  and so we'll start back at 2:00 and then we'll finish that and

13  hear y'all's -- I assume this is -- Do you have any other

14  evidence you want to offer?

15             MR. NORRED:  That's it, Your Honor.

16             THE COURT:  And then we'll hear final arguments.  I'll

17  give you a little longer than five minutes on your final

18  arguments.  Y'all can work on that during this time.

19             Okay.  Off the record.

20             (An off-the-record discussion was held between the

21  Court and counsel after which the Court recessed at 11:55 AM and

22  resumed the bench trial proceedings at 2:05 PM.)

23             COURT SECURITY OFFICER:  All rise.

24             THE COURT:  Thank you, all.  Please be seated.

25             Okay.  Ms. O'Laughlin, are you ready?
```

```
 1              MS. O'LAUGHLIN:  Yes, Your Honor.

 2              THE COURT:  Okay.  Here we go.  I hope you all had a

 3    good lunch.

 4              MS. O'LAUGHLIN:  We ask Mr. Sanchez to take the stand

 5    again.

 6              THE COURT:  What now?

 7              MS. O'LAUGHLIN:  We're asking Mr. Sanchez to take the

 8    stand.

 9              THE COURT:  Oh, Mr. Sanchez, you're still on the stand.

10    Thank you, sir.

11              Okay.  And you know you're still under the oath?

12              THE WITNESS:  Okay.  So I don't have to swear back in?

13              THE COURT:  No, no.  It's okay.  It's okay.

14              THE WITNESS:  I wanted to make sure you hear me this

15    time.

16              THE COURT:  No.  I messed it up the first time.  It's

17    my fault.

18              Okay.  Go ahead.

19                          CROSS EXAMINATION

20    QUESTIONS BY MS. O'LAUGHLIN:

21    Q.   Good afternoon, Mr. Sanchez.

22    A.   Good afternoon.

23    Q.   I would like Ms. Turner to pull up Exhibit 53 and I'd like

24    you to look at it and see if you recognize it.

25              MS. O'LAUGHLIN:  Maybe we'll pull up Exhibit 53.  Okay.
```

1   Q    (By Ms. O'Laughlin) Do you recognize this?

2   A.   Yes, ma'am.

3   Q.   And that's your signature?

4   A.   Yes, ma'am.

5   Q.   All right.

6        MS. O'LAUGHLIN:  Ms. Turner, if we could go to Page 11

7   of this exhibit.

8   Q    (By Ms. O'Laughlin) Do you see where this answer directs us

9   to Triple_D00041 to show use of the Tilted Star Logo in July of

10  2007?

11  A.   On the bottom line?

12  Q.   Yes.

13  A.   Triple_D00041?

14  Q.   Do you see how it directs us to look at that document to

15  show use of the Tilted Star Logo in July of 2007?

16  A.   Yes, ma'am.

17       MS. O'LAUGHLIN:  Ms. Turner, if you'll pull up

18  Exhibit 15.

19  Q    (By Ms. O'Laughlin) And is that this document?

20  A.   Yes, ma'am.

21  Q.   All right.  This is Rich Mind Records' order of T-shirts

22  from a supplier named "Mad Ink," correct?

23  A.   Correct.

24  Q.   And this doesn't describe what the Rich Mind logo is, does

25  it?

```
 1   A.   No, ma'am.

 2   Q.   It doesn't describe what the "D Tour compilation" is, does

 3   it?

 4   A.   No, ma'am.

 5   Q.   It doesn't state whether any logo appeared inside the neck

 6   of the T-shirt or on a hang tag where a manufacturer's brand

 7   would be, does it?

 8   A.   No, ma'am.

 9   Q.   And it doesn't state whether there are any other hang tags

10   or any other source indicators on these shirts.

11   A.   No, ma'am.

12   Q.   And it doesn't show what Rich Mind Records did with this

13   order, did it?

14   A.   I mean it shows that we made a purchase, ma'am.

15   Q.   But it doesn't show what Rich Mind Records did with this

16   order, does it?

17   A.   No, ma'am, I guess not other than the purchase.

18   Q.   All right.

19        MS. O'LAUGHLIN:  Could you go to Exhibit 53 again?  And

20   go to Page 14 of that.

21   Q    (By Ms. O'Laughlin) Do you see in your response where you

22   direct us to Triple_D000429 as reflecting use of the Ghost Logo?

23   A.   Yes, ma'am.

24   Q.   And you state in this answer that the use of the Ghost Logo

25   was on March 14th, 2008; correct?
```

1    A.   Yes, ma'am.

2              MS. O'LAUGHLIN:  Ms. Turner, will you pull up

3    Exhibit 16?  And if you'll go to Page 2.

4    Q    (By Ms. O'Laughlin) Are these those referenced March 14th,

5    2000, receipts?

6    A.   Yes, ma'am.

7    Q.   And on the receipts they mention "T-shirt" but none of them

8    specify what was on the T-shirt, do they?

9    A.   No, ma'am.

10   Q.   And these are the receipts that you've admitted forging,

11   correct?

12   A.   Excuse me?

13   Q.   These are the receipts that you have admitted forging,

14   correct?

15   A.   That I've admitted -- One more time, ma'am.

16   Q.   Admitted forging.

17   A.   Yes, ma'am.

18   Q.   All right.

19             MS. O'LAUGHLIN:  If you'll pull up 15 again and go to

20   Page 15.

21   Q    (By Ms. O'Laughlin) Do you see on this page where the

22   question asks you whose handwriting is on those receipts?

23   A.   My eyes are -- I can't really see that far but I'm trying to

24   read -- There you go.  So your question again, ma'am?

25   Q.   My question is:  Do you see where this question asks you to

1    state the names of each person whose handwriting is depicted in

2    that document that we just looked at?  Correct?

3    A.   Yes, ma'am.

4    Q.   All right.  And if you go down to the answer, you will see

5    where it says, "Triple_0028 through 0038 are the names of

6    purchasers of T-shirts and other merchandise.  No additional

7    information is known other than what is shown on the receipts."

8    Did I read that correctly?

9    A.   Yes, ma'am.

10   Q.   And you have not taken any steps to correct this answer,

11   have you?

12   A.   No, ma'am.

13   Q.   But you've admitted that that is your handwriting on those

14   receipts.

15   A.   Yes, ma'am.

16   Q.   And even the purported signatures on those receipts is your

17   handwriting.

18   A.   Yes, ma'am.

19          THE COURT:  Purported signatures of other people you

20   mean?

21          MS. O'LAUGHLIN:  Yes, Your Honor.

22          If you'd like to go back to Exhibit 16.

23          THE COURT:  Well, ask him that.

24   Q    (By Ms. O'Laughlin) Do you see where the first receipt says

25   something like "Tory Hickton" or "Hinton," correct?

```
 1   A.   Yes, ma'am.

 2   Q.   And that's your handwriting?

 3   A.   Yes, ma'am.

 4   Q.   And the signature line says an approximation of what that

 5   name is, correct?

 6   A.   Yes, ma'am.

 7   Q.   And that's your handwriting.

 8   A.   Yes, ma'am.

 9   Q.   And you never disclosed before this case that that was your

10   handwriting, correct?

11   A.   Request the question again.

12   Q.   Before this specific case in this federal court, you never

13   disclosed that that was your handwriting; correct?

14   A.   No, ma'am.

15   Q.   And you never disclosed that they were recreations of some

16   other receipts that you seemed to think you have.

17   A.   No, ma'am.

18   Q.   All right.  And when you produced them in the TTAB

19   proceeding, do you remember testifying about them during your

20   deposition?

21   A.   Yes, ma'am.

22   Q.   And during that deposition you testified as though they were

23   authentic, correct?

24   A.   Yes, ma'am.

25   Q.   And you watched your deposition testimony played in this
```

```
 1   court this morning, correct?

 2   A.   Yes, ma'am.

 3   Q.   And you testified about those receipts as though they were

 4   authentic in the first deposition you gave in this action,

 5   correct?

 6   A.   Yes, ma'am.

 7   Q.   And it was only after all of that questioning that you

 8   admitted they were forgeries, correct?

 9   A.   Yes, ma'am.

10   Q.   So it was your intent that the City would believe these were

11   authentic receipts when you produced them in the TTAB action,

12   correct?

13   A.   One more time, ma'am.

14   Q.   It was your intent that the City would believe these were

15   authentic customer receipts when you produced them in the TTAB

16   action, correct?

17   A.   Yes, ma'am.

18   Q.   And when you produced them again in this action before your

19   deposition, it was your intent that the City would believe that

20   these were authentic receipts, correct?

21   A.   Yes, ma'am.

22   Q.   You haven't produced any documents that show use of the

23   Ghost Logo before 2020, correct?

24   A.   Come again.

25   Q.   You have not produced any documents that show use of the
```

1  Ghost Logo before 2020, correct?

2  A.   Correct, I guess.

3  Q.   And when you produced handwritten invoices claiming that

4  they were sales of Ghost Logo merchandise, they were all

5  identified as retailers who are no longer in business; correct?

6  A.   Correct.

7  Q.   And during your Direct testimony, you did not present any

8  evidence, except your own word, that you used the Ghost Logo

9  before 2020.

10  A.   Correct.

11  Q.   All right.

12       MS. O'LAUGHLIN:  Will you pull up Exhibit 68?  And go

13  to Page 11.  Actually, first, go to the first page so he can see

14  what it is.

15  Q   (By Ms. O'Laughlin) Do you recognize this document?

16  A.   Yes, ma'am.

17  Q.   All right.

18       MS. O'LAUGHLIN:  Ms. Turner, you can go to Page 11.

19  Q   (By Ms. O'Laughlin) Can you read Interrogatory No. 23?

20  A.   Can you scoot it up a little bit?  Zoom it up a little bit?

21  Just a bit.

22       MS. O'LAUGHLIN:  A little bit smaller.

23  A.   Right there.

24  Q   (By Ms. O'Laughlin) Okay.

25  A.   The response or the actual interrogatory?

1  Q.   The interrogatory first.

2  A.   "State all owners of the trademark rights in the Ghost Logo.

3  Identify their respective time periods of ownership and identify

4  by Bates numbers all documents evidencing the assignment of each

5  owner's rights to the subsequent owner."

6  Q.   And will you now read your response?

7  A.   "The Ghost Logo was created solely by me and was my first

8  logo.  No one else had had ownership rights to the Ghost Logo

9  since its creation.  Like the Tilted Star Logo, it was developed

10 during the time of Stash House Studios/Rich Mind Records and

11 later managed under Triple D Gear, LLC, and the ownership of the

12 Ghost Logo remains with me."

13 Q.   And "me" refers to you as an individual, correct?

14 A.   Yes, ma'am.

15 Q.   All right.  And you described Triple D Gear, LLC's, role as

16 to manage the use of the Ghost Logo, correct?

17 A.   Correct.

18 Q.   And you have taken no steps to correct this answer, have

19 you?

20 A.   No, ma'am.

21 Q.   You haven't produced any documents in this case showing you

22 offered any items of apparel for more than $80, have you?

23 A.   Come again, ma'am.

24 Q.   You haven't produced any documents in this action that show

25 that you offered any goods of apparel that were priced at higher

1   than $80, correct?

2   A.   I have some but I guess not, correct.

3   Q.   All right.

4        MS. O'LAUGHLIN:  Ms. Turner, can you pull up

5   Exhibit 42?

6   Q   (By Ms. O'Laughlin) This is a hoodie that you've offered for

7   sale?

8   A.   Yes, ma'am.

9   Q.   And is the price $60?

10  A.   Yes, ma'am.

11       MS. O'LAUGHLIN:  Can you go to Exhibit 78?

12  Q   (By Ms. O'Laughlin) Do you recognize this?

13  A.   Yes, ma'am.

14  Q.   Is this a necklace that you offered for $50?

15       THE COURT:  You got to make reference to the exhibit

16  numbers.

17       MS. O'LAUGHLIN:  Excuse me.  This is Exhibit 78.

18  A.   Yes, ma'am.

19  Q   (By Ms. O'Laughlin) Is this the same necklaces that you

20  claim were stolen from you?

21  A.   Yes, ma'am.

22  Q.   And you testified that the reason you don't have the

23  original of the receipt book is because it was stolen and in the

24  same box as these necklaces, correct?

25  A.   Correct.

76

1  Q.   And you testified that there were about $80,000 worth of

2  necklaces in the same box as your receipt book, correct?

3  A.   No, ma'am.

4  Q.   What did you testify to at the deposition?

5  A.   The retail stuff, it was a group of stuff that was stolen.

6  Q.   All right.  And when Mister -- Okay.  Strike that.

7        MS. O'LAUGHLIN:  Ms. Turner, can you pull up

8  Exhibit 91?

9        (Exhibit 91 played in open court.)

10 Q    (By Ms. O'Laughlin) Do you recognize this video?

11 A.   Yes, ma'am.

12 Q.   Is that a video that you produced in this action?

13 A.   Yes, ma'am.

14 Q.   And does that video purport to show goods that you offered

15 under your Tilted Star Logo?

16 A.   Yes, ma'am.

17        THE COURT:  And that's exhibit number?

18        MS. O'LAUGHLIN:  This is Exhibit No. 91, the video.

19 Q    (By Ms. O'Laughlin) That first picture uses the Dallas

20 Mavericks' logo, doesn't it?

21 A.   No, ma'am.  That's a Triple D logo design, but you can ---

22 Q.   All right.

23        MS. O'LAUGHLIN:  Ms. Turner, can you pull up

24 Exhibit 58?

25 Q    (By Ms. O'Laughlin) Do you see that this is a registration

77

```
 1   of the Dallas Mavericks logo?

 2   A.   I can see that, yes, ma'am.

 3   Q.   You can see it has the same hat tilted as your previous cap?

 4           MR. NORRED:  Sorry, Your Honor.  I'm not -- I have to

 5   object.  This is not proper material for Cross.

 6           THE COURT:  Overruled.

 7   A.   The question again?

 8   Q    (By Ms. O'Laughlin) Do you see that this trademark

 9   registration has that same hat that was on your cap?

10   A.   It ain't the same one but I see a hat on there.  Yes, ma'am.

11   Q.   And you see that it has the background of a base -- of a

12   basketball, correct?

13   A.   I assume it's a basketball.

14   Q.   And that's the same that you produced on your cap, correct?

15   A.   Yes, ma'am.

16           MS. O'LAUGHLIN:  Ms. Turner, can you pull up

17   Exhibit 93?

18   Q    (By Ms. O'Laughlin) Do you recognize this?

19   A.   Yes, ma'am.

20   Q.   What do you recognize this as?

21   A.   As a flyer.

22   Q.   And does the flyer indicate that Christopher Cain is

23   offering hats with the Tilted Star Logo and the words "Triple D"

24   on it?

25   A.   Yes, ma'am.
```

1          MS. O'LAUGHLIN:  If you can go to Page 2.

2    Q    (By Ms. O'Laughlin) Can you read the first paragraph under

3    "Christopher Cain clothing"?

4    A.   "Michkel Cain has always incorporated his acute sense of

5    style into every aspect of life.  Residing in Dallas, Texas,

6    Mr. Cain decided to fulfill that life-long dream in 2008 by

7    launching a signature line of hats with New Era.  Everyone and

8    the majority of people represent our cities which is -- such as

9    New York and Atlanta.  Dallas is huge with plenty of money,

10   talent and beautiful scenery.  Let's get others wearing our city

11   name."

12   Q.   All right.

13          MS. O'LAUGHLIN:  Ms. Turner, can you pull up Exhibit

14   36?  If you'll go to the first page.

15   Q    (By Ms. O'Laughlin) Do you recognize this document?

16   A.   It looks familiar, yes, ma'am.

17   Q.   Do you recognize this as the initial disclosures that your

18   former business partner, Ahmed Youssef, served in the action in

19   which Youssef sought to cancel Freddie Jackson's trademark

20   registration?

21   A.   Yes, ma'am.

22          MS. O'LAUGHLIN:  Can you go to Page 2 of Exhibit 36?

23   Q    (By Ms. O'Laughlin) Can you read what's under Subparagraph

24   (A) which is the name and, if known, the address and telephone

25   number of persons likely to have knowledge of discoverable

1    information and the subjects of that information that Petitioner

2    might use to support its claims and defenses?

3    A.    You're asking me to do what, ma'am?

4    Q.    To read those, No. 1 and No. 2 under that Subparagraph (a).

5    A.    "Petitioner Ahmed Youssef may be reached through his counsel

6    of record, Christopher Cain, the originator of the use of the

7    Triple D logo on the hats and caps.  He may be reached at

8    214-336-3252."

9    Q.    You have not produced any assignment from Christopher Cain

10   to Triple D Gear, LLC, have you?

11   A.    No, ma'am.

12   Q.    All right.

13          MS. O'LAUGHLIN:  Ms. Turner, can you pull up

14   Exhibit 59?

15          THE COURT:  What was that used in?

16          MS. O'LAUGHLIN:  That was the TTAB proceeding in which

17   Mr. Youssef sought to cancel Freddie Jackson's registration.

18          THE COURT:  Ahh.

19          MS. O'LAUGHLIN:  Your Honor will have the pleasure of

20   reading about it in the depositions.

21          THE COURT:  Thank you.

22   Q    (By Ms. O'Laughlin) Do you recognize Exhibit 59?

23   A.    Yes, ma'am.

24   Q.    And that's from your website, correct?

25   A.    Correct.

1    Q.   And what does this depict?

2    A.   It's a Triple D cap with our city skyline.

3    Q.   Does it have a specific name?

4    A.   Skyline Victory Green Cap.

5    Q.   All right.  Can you read the first two sentences underneath

6    "Skyline Victory Green Cap"?

7    A.   Can you zoom in just a bit?  My eyes are -- "Introducing our

8    latest masterpiece, the limited edition Skyline Victory Green Cap

9    inspired by the Dallas Stars' iconic colors and skyline.  This

10   exclusive cap is a celebration of victory and style featuring the

11   Dallas skyline wrapped around the entire cap and adorned with a

12   rare Triple D cap -- cup patch.  It's a symbol of past glory and

13   future triumphs with its sleek black design accented by a bold

14   victory green outline with our iconic Triple D Tilted Star Logo.

15   This cap is a 'must have' for any fan, plus it's a perfect for

16   showing your green spirit on St. Patrick's Day.  Crafted for

17   comfort and style, it boasts a high crown structural design and a

18   flat visor that can be curved to suit your preference.  Don't

19   miss your chance to own a piece of history and elevate your style

20   game.  Get your limited edition Skyline Victory Green Cap today."

21   Q.   All right.  So you see where it claims that it was inspired

22   by the Dallas Stars' iconic colors, correct?

23   A.   Yes, ma'am.

24   Q.   Do you remember testifying at your deposition that the color

25   green had nothing to do with the Stars' team colors?

1    A.    I don't recall, ma'am.

2    Q.    All right.  So would it surprise you if you testified during

3    your deposition that the color green had nothing to do with the

4    Stars' team colors?

5    A.    It should.  I don't recall.

6    Q.    All right.  Do you recall testifying that you didn't know

7    what the Stanley Cup looks like?

8    A.    Yeah.  I'm not really familiar with it.

9    Q.    All right.

10         MS. O'LAUGHLIN:  Ms. Turner, can you pull up Exhibit 60

11   first?

12   Q    (By Ms. O'Laughlin) Do you see this is a trademark

13   registration owned by the National Hockey League?

14   A.    From what I'm reading, yes, ma'am.

15   Q.    Do you recognize that as an image of the Stanley Cup?

16   A.    It is a cup.  It doesn't say "Stanley Cup," but ---

17   Q.    I asked if you recognized it as an image of the Stanley Cup.

18   A.    It's a cup.  I don't recognize it as the Stanley Cup but

19   it's a cup.

20   Q.    All right.

21         MS. O'LAUGHLIN:  Ms. Turner, can you pull up

22   Exhibit 61?

23   Q    (By Ms. O'Laughlin) Do you recognize the mark depicted in

24   this trademark registration owned by the National Hockey League?

25   A.    Yes, ma'am.

1    Q.   Do you recognize this as depicting the Stanley Cup?

2    A.   Yes, ma'am.

3    Q.   All right.  Do you sell a cap that bears an approximation of

4    this trademark?

5    A.   Yes, ma'am.

6    Q.   All right.

7         MS. O'LAUGHLIN:  Ms. Turner, if you could use the Elmo

8    to display this exhibit.

9    Q    (By Ms. O'Laughlin) This is Exhibit 27.  Do you recognize

10   this as a cap that you sell?

11   A.   Yes, ma'am.

12   Q.   Do you recognize the logo on the side as a facsimile of the

13   Stanley Cup registration we just looked at?

14   A.   Yes, ma'am.

15   Q.   All right.  You didn't actually contact the National Hockey

16   League to obtain permission to use this mark, did you?

17   A.   No, ma'am.

18   Q.   All right.  Do you remember testifying that you didn't

19   believe that the design on the side of your cap looked like that

20   registration?

21   A.   Yes, ma'am.

22   Q.   But today, you can recognize that they look alike; correct?

23   A.   Yes, ma'am.

24   Q.   Do you see the shield on Exhibit 27?

25        MS. O'LAUGHLIN:  If you'll put that back on.

83

```
1    A.    The shield?

2    Q    (By Ms. O'Laughlin) Around the Triple D Tilted Star Logo

3    there's a shield outline.  Do you see that?

4    A.    With the dates on it?

5    Q.    No.  That's a different -- There's an actual shield.  I

6    don't believe we're actually getting a good image on that, so I

7    will withdraw that question.

8          MS. O'LAUGHLIN:  Ms. Turner, if you could pull up

9    Exhibit 48.

10         MR. NORRED:  Your Honor, assuming this is going to

11   continue the way that it is, I just want to make sure that the

12   Court knows I object to the additional substantive matter under

13   Rule 611.

14         THE COURT:  Just make your objections when they're

15   timely because this is an objection to this exhibit?  I don't

16   allow objections broadly.  You have to do it based on each --

17   each document.

18         MR. NORRED:  Under Rule 611, Your Honor, I'd say this

19   is not a subject that we had discussed during -- during Direct or

20   Cross.  So it shouldn't be allowed -- it shouldn't be allowed

21   now.

22         THE COURT:  Overruled.

23   Q    (By Ms. O'Laughlin) Do you recognize Exhibit 48?

24   A.    I can't really read it this far, but ---

25         MS. O'LAUGHLIN:  Ms. Turner, can you make it larger and
```

1    show the "From" and the "To" line of this document?

2    A.   Yes, that's an e-mail from our attorney at the time, being

3    David Small.

4    Q    (By Ms. O'Laughlin) And I believe you testified that

5    "RichMindRecords@gmail.com" is your e-mail address?

6    A.   Correct, ma'am.

7    Q.   So you got this e-mail, correct?

8    A.   Correct.

9    Q.   All right.

10         MS. O'LAUGHLIN:  Ms. Turner, if you can scroll down to

11   where ---

12   Q    (By Ms. O'Laughlin) So it says, "Dear Ahmed and Arturo," so

13   that's you and your former business partner, Mr. Youssef;

14   correct?

15   A.   Correct.

16   Q.   And the first full paragraph under "Please accept this

17   letter as a summary of our conversation today," if you go through

18   that paragraph, there's a sentence that says, "I maintain that

19   the City of Dallas may have an issue regarding the mark which is

20   strikingly similar to the nationally recognized City of Dallas

21   logo."

22         Did I read that correctly?

23   A.   I can't really see that, but yes.

24         THE COURT:  Can you not outline in yellow or something

25   that makes it easier to read?

1      MS. TURNER:  Yes, I can.

2      THE COURT:  No.  Perfect.

3  A.    There you go.

4  Q    (By Ms. O'Laughlin) Can you read that?

5  A.    "I maintain the City of Dallas may have an issue regarding

6  the mark which is strictly similar to the nationally recognized

7  City of Dallas logo."

8  Q.    So even your own lawyer told you that he thought your mark

9  looked like the City's logo, correct?

10  A.    In his opinion, yes, ma'am.

11      MS. O'LAUGHLIN:  Ms. Turner, can you play the video

12  that's Exhibit P-5?

13      THE COURT:  Wait, wait, wait.  Go back to that.  I was

14  reading it.

15      MS. O'LAUGHLIN:  Oh.  Yes, Your Honor.

16      MR. NORRED:  Upper left.

17      MS. O'LAUGHLIN:  I believe it's -- Yes.

18      THE COURT:  Well, what's the document number?  I'll

19  just read it up here.

20      MR. NORRED:  48.

21      MS. O'LAUGHLIN:  That is 48, Your Honor.

22      THE COURT:  48, okay.  I can't read it.  It's too

23  little.

24      MS. O'LAUGHLIN:  If Your Honor will allow, we will

25  supplement it with a larger copy.

86

 1          THE COURT:  Just go back to that.  I don't want to have

 2  to go back a bunch of times, so just go back to that.  The next

 3  paragraph I was reading.

 4          MS. O'LAUGHLIN:  The one starting with "Mr. Jackson's

 5  application"?

 6          THE COURT:  Yes.

 7          MS. O'LAUGHLIN:  Okay.

 8          THE COURT:  Okay.

 9          MS. O'LAUGHLIN:  All right.  Thank you, Your Honor.

10          Ms. Turner, will you now play Exhibit 5, Plaintiff's

11  Exhibit 5.

12          (Plaintiff's Exhibit 5 played in open court.)

13  Q    (By Ms. O'Laughlin) Is that you in the video?

14  A.   Yes, ma'am.

15  Q.   Do you remember testifying during your deposition during the

16  TTAB proceeding that you didn't mean it when you said you took

17  the City's logo?

18  A.   Yes, ma'am.

19  Q.   And do you remember testifying that it was just something

20  you said?

21  A.   Yes, ma'am.

22  Q.   You listened to your testimony by deposition this morning,

23  correct?

24  A.   Yes, ma'am.

25  Q.   And you heard your testimony that Rich Mind Records owned

```
 1    the Tilted Star Logo on the date the application for the first

 2    Tilted Star Logo was filed?

 3    A.   Yes, ma'am.

 4    Q.   And you don't have an assignment from Rich Mind to Triple D

 5    Gear, LLC, do you?

 6    A.   No, ma'am.

 7    Q.   And you don't have an assignment from you as an individual

 8    to Triple D Gear, LLC, either.

 9    A.   No, ma'am.

10    Q.   All right.

11           MS. O'LAUGHLIN:  No further questions.

12           THE COURT:  Mr. Norred?

13                    REDIRECT EXAMINATION

14    QUESTIONS BY MR. NORRED:

15    Q.   Arturo, did you use the receipt books we talked about

16    earlier during the registration process?

17    A.   No, sir.

18    Q.   When did you create those?

19    A.   Come again?

20    Q.   When did you create the receipt books?

21    A.   After reviewing everything and after seeing everything, I

22    created the books after the fire that we had.

23    Q.   And why did you create them?

24    A.   Because in the fire, when we had the fire, we didn't -- I

25    lost a lot of documents.  I lost a lot of documents of invoices,
```

1    contracts, everything that we had at the time being.

2    Q.    So you -- So you created them after the fire.  Did you

3    create them for purposes of this litigation?

4    A.    No, sir.

5    Q.    Okay.  Did Christopher Cain ever have any legitimate claim

6    to ownership to any of the Triple D works or marks?

7    A.    No, sir.

8    Q.    You said you don't have an assignment.  You don't have a

9    written assignment, right?

10   A.    No, sir.

11   Q.    Do you have -- Do you have an oral assignment?

12   A.    As business partners.

13   Q.    I mean you wear all the hats, right?

14   A.    Yes, sir.

15   Q.    Okay.  A few minutes ago we looked at -- This is Plaintiff's

16   15.  When you look at this, what tells you what mark is being

17   used?

18   A.    The invoice tells you what marks are being used.

19   Q.    It says Rich Mind logo and the D Tour compilation.

20   A.    Correct.

21   Q.    Is that -- Are you familiar with that shirt?

22   A.    Yes, sir.

23   Q.    Would I find that shirt right here?

24   A.    Yes, sir.

25   Q.    And so here's the -- this D Tour.  Tell the Court about

```
 1    this, what this is talking about.

 2    A.   This D Tour is a compilation; was an album that we dropped

 3    back in '08, '09.

 4              MR. NORRED:  This is Plaintiff's 88, by the way.

 5    Q    (By Mr. Norred) And so this -- Is this a flyer?  Is this a

 6    poster?  What is this?

 7    A.   That is the front cover to our album, sir.

 8    Q.   Front cover to the album, okay.  And so are the shirts that

 9    are involved in this using the Tilted Star Logo?

10    A.   Correct, sir.

11    Q.   And what part of it -- What is this part of the exhibit?

12    A.   That is the actual mock-up that we submitted, that was

13    needed to be submitted to New Era for their manufacturing of our

14    hats that we had at the time being.

15    Q.   Now we mentioned "New Era" a couple of times.  Can you tell

16    the Court who "New Era" is?

17    A.   New Era is one of the biggest manufacturers in the

18    United States.

19    Q.   Of what?

20    A.   Of fitted hats; a cap.

21    Q.   Caps?

22    A.   Caps.

23    Q.   You called it "fitty" hats?

24    A.   Fitted.  Fitted.

25    Q.   "Fitted"?
```

1   A.   Fitted hats.

2   Q.   Is this your standard ballpark cap?

3   A.   Yes, your standard ballpark cap.  It's ---

4   Q.   Okay.

5   A.   Yeah.

6   Q.   So is this a mock-up or re-creation or an actual invoice or

7   what -- what is this document?

8   A.   It's a -- It's a mock-up that we have to register and mock

9   up for the manufacturers at New Era.

10  Q.   When I say "mock-up," I don't -- it's not a re-creation.

11  This is a document that was used to order the caps?

12  A.   Correct.

13  Q.   Okay.  And what is this image?

14  A.   That right there is a magazine.

15  Q.   And why do we have this in the exhibit?

16  A.   Because that was a magazine that was published when I had

17  the record label at the time in 2009.

18  Q.   Now is this all during the same time that Christopher Cain

19  was trying to start his own gig?

20  A.   Yes, sir.

21  Q.   So when did that come to an end?

22  A.   Right after this.

23  Q.   Okay.  Now I've got -- This is Defendant's 29, the docket of

24  the Tilted Star application.  Oh, this is the Ghost Logo.

25       So you have a specimen that you had with this.  There's the

1    drawing, right?

2    A.    Correct, sir.

3    Q.    And describe what this specimen is.

4    A.    Those are one of our first merchandises that we ever did in

5    our beginning of our merchandising for our company -- for the

6    music industry.

7    Q.    And when was this made?

8    A.    Between the 2006 and 2007 era.

9    Q.    Okay.  And this is a specimen that's used in the Ghost Logo

10    at registration?

11    A.    Yes, sir.

12    Q.    Okay.

13              MR. NORRED:  I pass the witness, Your Honor.

14              MS. O'LAUGHLIN:  No further questions.

15              THE COURT:  All right.  You can step down.  Thank you,

16    sir.

17              THE WITNESS:  Thank you.

18              THE COURT:  All right.  Anything else, Mr. Norred?

19              MR. NORRED:  No, Your Honor.

20              THE COURT:  Do both sides rest?

21              MS. O'LAUGHLIN:  We rest, Your Honor.

22              THE COURT:  Close?

23              MR. NORRED:  Close.

24              MS. O'LAUGHLIN:  We close.

25              THE COURT:  All right.  Argument?

```
1              MS. O'LAUGHLIN:  Yes, sir.

2              THE COURT:  How much time do you need?

3              MS. O'LAUGHLIN:  I'm going to keep it very short

4    because I know Your Honor can read things faster than I can

5    speak.

6              THE COURT:  Oh, wow.

7              MS. O'LAUGHLIN:  And I also know that our Proposed

8    Findings of Fact and Conclusions of Law are roughly 43 pages.  So

9    I won't go through all of them, but they will give you a road map

10   to reach the decision that we believe is appropriate.

11             THE COURT:  Are they -- Since you -- Since you gave me

12   a book, are they gilded on the edge or anything like that?

13             MS. O'LAUGHLIN:  I am sorry, Your Honor.  We do have

14   three claims and we had to be thorough.

15             THE COURT:  No.  I'm not fussing at you.  You and every

16   other lawyer, you just -- y'all just can't quit talking and

17   writing.

18             MS. O'LAUGHLIN:  It's a flaw, and they tried to beat us

19   out in law school and we turned out wanting to speak even a

20   little bit more.  It's -- It's amazing.

21             THE COURT:  Okay.  I know.  I've taught law school a

22   long time.  Ask Mr. Norred.

23             Okay.  Here we go.

24             MS. O'LAUGHLIN:  All right.  Thank you, Your Honor, for

25   your attention to this case.  It's been a pleasure to be in your
```

 1    courtroom this afternoon and this morning.

 2           THE COURT:  Oh, no.  I appreciate y'all and it's both

 3    sides.  Thank you, all, very much.

 4           MS. O'LAUGHLIN:  All right.  And so as Your Honor

 5    knows, we have three different claims seeking cancellation of

 6    three trademark registrations.

 7           The first claim is directed solely to the Ghost Logo

 8    and it is for *de novo* review of the TTAB proceeding's decision

 9    which held only that the Dallas -- City of Dallas did not submit

10    evidence of use of its mark on T-shirts for others.  We have now

11    corrected that evidentiary hold that the TTAB believed was

12    necessary.  We maintain that it's legally not relevant because

13    it's about consumer perception.  But you have evidence of a

14    T-shirt from 2005 that bears the City's logo and was given to

15    others.  You have a newspaper from 1972 showing that the City has

16    used its logo for over 50 years.

17           So from a priority perspective, the Defendant is only

18    entitled to the dates of his applications.  He cannot claim -- He

19    has to prove any date earlier than the application.  Your Honor

20    has heard no evidence, other than Mr. Sanchez's word, and we know

21    that Mr. Sanchez was caught forging evidence for this very case,

22    and he can spin it all he wants, but you heard all of the

23    questions that I asked about that receipt book and how he

24    answered them as though it was authentic and he just didn't

25    remember that he had forged them, and that defies credibility,

 1    Your Honor.

 2            Mr. Warren –– Mr. Norred –– excuse me –– pointed to the

 3    specimen in the 2020 application.  Well, we again only have

 4    Mr. Sanchez's word that that was created anytime before 2020.  So

 5    again with priority, the City has shown priority to what

 6    Defendant has established through any credible evidence.

 7            For likelihood of confusion –––

 8            THE COURT:  When is the City's position is the earliest

 9    date on any of the three?

10            MS. O'LAUGHLIN:  So the earliest date of its use for

11    certain goods and services was 1972.

12            THE COURT:  Not you.  Them.  Them.

13            MS. O'LAUGHLIN:  They, oh.  I don't believe there's any

14    evidence that I have seen or certainly no evidence presented in

15    this courtroom that the Ghost Logo was used before 2020.  That is

16    our contention, that it was not used before 2020.

17            So moving from priority, the second element on our

18    first claim is likelihood of confusion.  And on this one we

19    appear to agree with the other side.  These are the proposed

20    findings that Defendant filed in this case on September 19th.

21    And I know it's a little blurry now, so I'm going to ask

22    Ms. Turner to blow it up a little, if she can.

23            And all of these proposals are that the City has a

24    protectable trademark; that the Defendant has used a similar mark

25    to Plaintiff; that Defendant's use is likely to cause confusion

1    among consumers; that the strength of the mark is significant;

2    that the products and services by both parties are similar.

3          And I will -- can go on.  But despite filing this over

4    two weeks ago and despite the fact that we responded to it almost

5    two weeks ago, Defendant took no steps to correct this proposal.

6    So it appears that they now agree that the City wins on terms of

7    ownership of its mark and likelihood of confusion.

8          Our second claim is for cancellation to rectify the

9    register, and this goes to the issue of:  Were the applications

10   filed in the correct name?

11         Now Mr. Norred stated, without any authority because

12   none exists, that we can only seek to cancel the first Tilted

13   Star Logo on the basis of fraud.  That is simply not true.  The

14   Court can use its power to cancel a registration to rectify the

15   register even for a mark that hasn't been assigned incontestable

16   status.

17         As far as ownership, our stipulated facts submitted in

18   our Joint Pretrial Order is that Mr. Youssef, who was the

19   applicant of that first Tilted Star registration, did not own it

20   when he filed that application.  The -- There's been no

21   assignment from Rich Mind or Mister -- Mr. Sanchez of their

22   alleged ownership either.  So we know that Triple D Gear, LLC,

23   still did not have full ownership rights when it filed the second

24   Tilted Star Logo registration application.

25         And then with the Ghost Logo, you saw the interrogatory

96

```
 1    answers.  Mr. Sanchez said, "I am the owner of this mark.  Triple

 2    D Gear just manages it."

 3              So, again, all three applications were filed by the

 4    wrong applicant, and this is an issue that cannot be fixed.

 5    Mr. Norred has cited to a general statute that allows certain

 6    corrections, such as if Mr. Youssef spelled his name wrong.

 7    Instead of Y-O-U-S-S-E-F, they left out one of the Ss.  That

 8    would be the type of error that that statute would allow you to

 9    correct.  The law is crystal clear that if the wrong person files

10    a trademark application and claims ownership, those registrations

11    are void.

12              And finally, our third registration or third basis for

13    canceling the registration is fraud on the Trademark Office.

14    When Your Honor reads the rest of the deposition testimony and

15    looks at our agreed stipulated facts, you will see that the

16    Defendant has admitted claiming goods and services that were

17    never offered.  You'll also see that despite Mr. Sanchez's own

18    words that he took the City's logo and put a Tilted Star in it,

19    that he never disclosed the City's interest in its logo to the

20    Trademark Office.  These are bases of fraud and they are clear.

21              So, again, thank you for your time today, and we ask

22    you to cancel these three registrations on each of the foregoing

23    bases.

24              THE COURT:  Thank you.

25              Mr. Norred?
```

1          THE COURT:  Thank y'all both for being very succinct

2     today.  I appreciate it.

3          And in answering, Mr. Sanchez, thank you for answering

4     the questions straight up.  Okay?

5          MR. SANCHEZ:  Okay.

6          THE COURT:  All right.

7          MR. NORRED:  I think the famous line is "briefly,"

8     Your Honor.

9          THE COURT:  Okay, "briefly."  "Briefly."

10         MR. NORRED:  I spent a lot of time on some exotic

11    software to put together this closing, so I hope the Court

12    appreciates it.

13         We agree that the City has a strong mark for municipal

14    services.  It's not the same thing.  To the extent that -- that

15    the legal conclusions go beyond that, they ought not.  We agree

16    that municipal services, they're the king.  They got a good

17    strong mark.

18         I thought some actual citation of law might be helpful.

19    A Petition to Cancel can only be filed ---

20         THE COURT:  Do you have -- Do you have a case that

21    cites that it's limited to the municipal?  Do you have a case or

22    something I can look that says what you just said?

23         MR. NORRED:  What I just said is they have a strong

24    mark.  No.  I just -- We don't -- We don't deny the City has a

25    strong mark for municipal services.

1          THE COURT:  Okay.  What makes you say that it's limited

2    to that?  That it doesn't include T-shirts and all the other

3    things?

4          MR. NORRED:  Well, ordinary trademark laws is by -- is

5    by class.  And so you get your class and then you can stop others

6    sometimes if it's ---

7          THE COURT:  Won't there be a case that says what you

8    say?

9          MR. NORRED:  There's a case that talks about zone of

10   expansion.  I think that's been the implicit argument.

11         THE COURT:  Okay.  Where is it?  I don't see it.

12         MR. NORRED:  Well, we don't think that it's valid for

13   them and they haven't asserted it in that fashion.  So I haven't

14   responded to that.  Now I'm happy to do a post-trial ---

15         THE COURT:  I mean they've shown T-shirts and all these

16   other things.

17         MR. NORRED:  Oh, sure, but we will get there.

18         THE COURT:  You're just saying that's not valid.

19   Whatever they did, they didn't register that and so they don't

20   get it.

21         MR. NORRED:  They didn't register it, but that's not

22   really -- I'll get -- I have a case for you on that, on that

23   issue, sponsorships and contests and things like that.  We'll get

24   there.  I promise.  Let me just zip through here.

25         The City has not provided any evidence that they would

```
 1    suffer any damage from the continued registration of our marks.

 2    They -- They lose just on that.  They -- You can't simply say, "I

 3    think that this person shouldn't have a mark," and, therefore,

 4    get involved.  They don't have standing for that.

 5                THE COURT:  Okay.

 6                MR. NORRED:  Now they -- This -- They just simply

 7    haven't given you any evidence of that.  Now we talk about

 8    this ---

 9                THE COURT:  So other people can use their mark -- let's

10    just say anybody that wanted to do it -- anytime.

11                MR. NORRED:  If you provide evidence it's going to hurt

12    you, absolutely, but you haven't heard any evidence.  There's

13    been no evidence provided that I heard in the last day on that.

14    So you can -- People can allege things all day long, but

15    evidence; right?

16                So American Heritage ---

17                THE COURT:  So everybody can go out here and make all

18    the caps they want with the City of Dallas logo on it and that's

19    okay.

20                MR. NORRED:  Well, if -- if -- No.  That's

21    infringement.  They're going to be infringing either -- If it's

22    got the City of Dallas logo on it and -- then if it's got the

23    City of Dallas logo, then they're going -- they're going to have

24    a claim because it allowed ---

25                THE COURT:  Even without damages.
```

1          MR. NORRED:  No.  They'll -- They'll -- Whenever

2     somebody is infringing your mark, that's different from trying to

3     cancel somebody else's registration.

4          THE COURT:  Okay.

5          MR. NORRED:  So what you're talking about is

6     infringement.  Nobody's -- Nobody's alleging that any -- Well,

7     today, nobody's alleging anybody else is infringing.  That's

8     not -- That's not before the Court.

9          THE COURT:  Okay.

10          MR. NORRED:  So *American Heritage Life Insurance versus*

11     *Heritage Life Insurance*, 494 F2d, Fifth Circuit case, talks about

12     it being in the nature of a trial *de novo* but as we get down

13     here, we do not suggest the doctrines with respect to

14     administrative proceedings are not applied with the same rigidity

15     as our judicial counterparts, talking about *res judicata*.  On the

16     contrary, in the context of a direct appeal from a Patent Office

17     decision on an application for registration, this Court has held

18     findings as to confusing similarity of marks must be accepted as

19     controlling unless the contrary is established by evidence which

20     in character and amount carries through conviction,

21     notwithstanding that the case is heard *de novo* in the District

22     Court."

23          It's kind of an odd, unusual standard.  So even though

24     this is -- in this case was an infringement and cancellation

25     action rather than a direct appeal from the Patent Office, in our

1  judgment, the thorough conviction standard extends to all

2  findings made by the Patent Office in quasi judicial adversarial

3  proceedings between the same parties and emanating from the

4  Office's expertise.

5          All this is simply to say that even though this is

6  *de novo*, this Court should take into account what the USPTO

7  found, and it should be -- to overturn that, should be evidence

8  which is in character and amount carries through conviction.  And

9  there's another phrase that's used a couple of times.

10          Did I do that wrong?  There we go.  It went to the next

11  page.

12          Consequently, while the findings do not merit

13  application of the Doctrine of Collateral Estoppel, they will be

14  accepted by the federal court unless the contrary is established

15  by evidence which carries through conviction.  And that "carries

16  through conviction" language goes all the way back to the Supreme

17  Court, 1894.  There's a -- They go back and back.

18          So what the USPTO did does not control this Court, but

19  the Court should be thoroughly convicted that they got it wrong

20  before the Court makes a contrary decision.

21          Now contrary to what you just heard a minute ago, if

22  you just read the clear text, which I was in the process of

23  posting on here, ---

24          THE COURT:  So you're saying *"de novo"* doesn't mean

25  *"de novo."*  I can't just disagree.

1          MR. NORRED:  That's -- That's what the case law says,

2    and it says it in many cases.  I just picked ---

3          THE COURT:  Then it's not *de novo*.

4          MR. NORRED:  It's not completely *de novo*.

5          THE COURT:  Where does it say that?

6          MR. NORRED:  It says that if you -- "This Court has

7    held -- The Fifth Circuit has held the findings as to confusing

8    similarity of marks must be accepted as controlling unless the

9    contrary is established by evidence which in character and amount

10   carries through conviction."

11         THE COURT:  Is that a *de novo* case?  Is that the burden

12   of proof in that case that you're citing?

13         MR. NORRED:  It is.  And it talks about it up here,

14   *de novo*.

15         THE COURT:  Okay.

16         MR. NORRED:  But you'll see this in many cases.  I just

17   picked out one that was a nice, clear Fifth Circuit case.

18         THE COURT:  Okay.

19         MR. NORRED:  And what it comes down to in one of the

20   cases -- it's not Fifth Circuit -- said, "Well, you're just not

21   free to ignore them."  You know, you have to start almost with a

22   running start for the whoever won at the USPTO.

23         And I can -- I was going to bring all this tomorrow.  I

24   expected this to take longer.  My apologies.  I can certainly

25   bring a copy, but that's -- that's a real case, right?

1          And that's not -- There's another one that's from 2022,

2   recently, but it didn't -- it wasn't as clear as this, so I used

3   this one.

4          The text of 15 USC 1057(e) says "entity."  It does not

5   say "misspelling of name."  It says, "The wrong entity files."

6   That's the language of 1057(e).

7          And here's the case that you were looking for.

8          "When the Federal Circuit affirmed the denial of

9   Dr. Pepper Company's appeal from the refusal to register 'Pepper

10  Man' as a service mark on the ground that applicant's asserted

11  service of sponsoring a particular contest to promote its soft

12  drinks was not a service within the Trademark Act."

13         If the City was correct in its argument, then everyone

14  who had a logo on the back of that T-shirt could go file an

15  application for a registration of trademark for clothing,

16  T-shirts for others.  But what do you not see there?

17         You don't see -- In every specimen that's accepted by

18  -- by the USPTO, the specimen has to show the mark used in

19  commerce and the class that matters.

20         Now we talked a little bit about my client's inability

21  to have, you know, socks or underwear or whatever, and he didn't

22  get that.  Why didn't he?  Because you have to show a specimen.

23  So you have to show a specimen of what you're doing commercially.

24         So sponsorships and contests generally, again, I picked

25  out one case.  But generally speaking, promotional giveaways do

1    not cut it.  They just simply aren't sufficient.

2           So the hole remains for clothing.  Triple D has never

3    argued against a city's priority on municipal services.  That

4    word "confusion" is wrong.  So we are asserting that the fraud is

5    not met.

6           Here's a claim -- Here's a case that you may be

7    familiar with.  A claim of fraud requires several elements and

8    the last one, damage from such reliance.  Even if you give them

9    all the rest of it, there's been no damage from such reliance.

10   We haven't even -- We don't even know that -- that several of

11   these other elements made it, but there's been no damage from

12   such reliance.  What we see here is a man who worked for another

13   man.  He got off a little bit further than he's supposed to get.

14   He filed the trademark application he's supposed to file.  The

15   specimen that is part of that application is product that Rich

16   Mind Records sold.  So ---

17          THE COURT:  Wouldn't you agree this is the hardest part

18   of your argument?

19          MR. NORRED:  Yes.  Yeah, --

20          THE COURT:  Okay.

21          MR. NORRED:  -- absolutely, yeah.  But it's fixable.

22   And when we have the incontestability, now -- now we have an

23   issue of:  Look, it's incontestable.  So you have to really show

24   -- You really do have to show fraud.  You have to show fraud.

25          Did my client show fraud?  No, he did not.  It's not --

1    You can't even -- There's not even been any allegations regarding

2    the Tilted Star of any fraud.  The receipt book stuff is all

3    about the Ghost Logo.

4            You seen multiple specimen from late 2000s, 2007, '8

5    and '9 just in the last few minutes that show that clearly he was

6    selling it, the Tilted Star merchandise, before 2010.  So that

7    part's -- that part, I think, is easy.  The only hard part is

8    what do you do when you have an agent that goes off and he's

9    supposed to file a mark for you and he files it in his own name?

10   Now you got to clean it up.

11           What should have happened was there should have been a

12   petition under 1057 which specifically has the word "entity" in

13   it, not just misspelling names.  This is not a *nunc pro tunc*.  We

14   said something a little bit wrong.  No.  This is the wrong

15   entity.

16           And then we have the doctrine.  We talked about this in

17   the MSJ a little bit, the doctrine of related companies.  I think

18   we get it from that.  We didn't talk about that here because

19   that's a legal argument, but I think we get it from that.  I know

20   I'm a zealous advocate for my side, but I think it's legitimate

21   for whatever that's worth.

22           Anyway, there you go, Your Honor.  I'm happy to answer

23   any other questions.  We don't think that the Court -- that the

24   other side has shown by clear and convincing evidence that the

25   applicant made false statements with the intent to deceive the

106

1    PTO.  We ask the City's requested remedies be denied in full.

2              Thank you very much, Your Honor.  It has been a joy.

3              THE COURT:  Thank you, Mr. Norred.  I appreciate it.

4              Ms. Fast, I meant to say "thank you" for your straight

5    answers, too.

6              MS. FAST:  Thank you.

7              THE COURT:  Okay.  Any other argument --

8              MS. O'LAUGHLIN:  Yes, Your Honor.

9              THE COURT:  -- to follow up?

10             MS. O'LAUGHLIN:  Briefly.

11             THE COURT:  Just saying "briefly" doesn't mean briefly,

12   but it's okay.

13             MS. O'LAUGHLIN:  I know.  And I will try to be

14   briefly --

15             THE COURT:  Y'all have been very brief today.

16             MS. O'LAUGHLIN:  -- because I really want to answer

17   some of the questions that Your Honor posed to my opposing

18   counsel because I think Your Honor might want to hear our

19   perspective on it.

20             THE COURT:  I do.

21             MS. O'LAUGHLIN:  The law on a *de novo* review is clear.

22   What the cases Mr. Norred is citing has to deal with, if the City

23   chose not to introduce new evidence, then there might be some

24   deference given to the TTAB based on the evidentiary record that

25   it considered.  But, more importantly, he kept harping on this

1    quote about a finding of likelihood of confusion.  The TTAB never

2    addressed that issue.  You can read that Opinion.  You will see

3    it is not addressed.  That is because there were two different

4    elements.

5         The first was priority, and the TTAB found that because

6    we did not introduce evidence of T-shirts for others at the TTAB

7    proceeding.  That means they didn't even have to consider

8    likelihood of confusion.  So, again, even if you wanted to show

9    deference on likelihood of confusion, there's nothing to defer to

10   because they made no findings on that.

11        Second, Mr. Norred keeps saying the word "entity" is

12   not -- is in 1057, and I would just like to read the section he

13   keeps saying.

14        "Upon application of the owner, the Director may permit

15   any registration to be surrendered for cancellation.  And upon

16   cancellation, appropriate entry shall be made in the records of

17   the United States Patent and Trademark Office.  Upon application

18   of the owner and payment of the prescribed fee, the Director for

19   good cause may permit any registration to be amended or to be

20   disclaimed in part provided that the amendment or disclaimer does

21   not alter materially the character of the mark.  Appropriate

22   entry shall made in the records of the United States Patent and

23   Trademark Office and upon the Certificate of Registration."

24        So I'm not sure what Mr. Norred was referring to, but

25   the statute is very clear that what you can change is an

1    amendment that doesn't materially alter the character of the

2    mark.

3          What we have here, we look to a very different section

4    of the law, and we've cited multiple cases in our trial brief as

5    well as in our Proposed Findings of Fact and Conclusions of Law

6    which show that Mr. Norred is just simply incorrect about the

7    law.  If the applicant was wrong, then that is something that

8    cannot be cured.

9          And so finally, Mr. Norred kept saying the City has not

10   shown damage.  Well, damage is actually not an element of any of

11   the claims that we have asserted, but the City has been harmed,

12   and the Defendant did not contest this at the TTAB and doesn't

13   really contest it here.  The reason it has been harmed is it

14   filed its own application for its logo and it was denied on the

15   basis of the existing registrations for which the Defendant is

16   the registrant, and there is plenty of case law that that is

17   sufficient to show harm.

18         But perhaps even more important to that, even though

19   it's not legally necessary, you heard Ms. Fast's testimony.  The

20   City has to control its reputation.  It has to make sure that if

21   someone sees a T-shirt on someone in the public and believes that

22   it is associated with the City, that it has control over that,

23   and Your Honor even mentioned that.  You've seen the T-shirts at

24   Mama's Daughters' Restaurants, and they happen to sell them, I

25   believe.  I know Chuy's sells T-shirts, but there are plenty of

1    restaurants that don't sell T-shirts.

2         And by his argument, I could go into any restaurant

3    that doesn't sell T-shirts and just take their logo and put it on

4    a T-shirt and then it's mine, and that's what it really comes

5    down to.  He's claiming ownership of something that he admitted

6    he took from the City, and that is just legally and factually

7    wrong.

8         Thank you, Your Honor.

9         THE COURT:  All right.  I thank y'all for moving this

10   along.  I thought this might take several days but y'all were --

11   both sides were good to be succinct.  It's always valuable.  I

12   will remember that when you both are back in here again.  Thank

13   you very much.

14        Let me say this:  I do find for the City of Dallas on

15   Count Two.  The evidence before the Court establishes that, one,

16   each of the three trademark applications that resulted in those

17   registrations at issue here were filed by persons or entities who

18   were not the owners of the marks at the time the applications

19   were filed, thereby rendering the applications void and the

20   resulting trademark registrations void.  Youssef, Ahmed was

21   either not the owner or was not the sole owner when he filed the

22   application for the first Tilted Star Logo which is the '688

23   Trademark Registration.  Either Rich Mind Records owned the logo

24   or Mr. Ahmed and Mr. Sanchez owned it, co-owned it.

25        Defendant Triple D Gear, LLC, was not the sole owner

1   when it filed the application for the second Tilted Star Logo

2   which is the '048 Trademark Registration.  Youssef, Ahmed was not

3   the sole owner of the first Tilted Star Logo.  So his assignment

4   of ownership rights in that logo could only have been an

5   assignment of partial ownership.  So Defendant Triple D Gear,

6   LLC, was at most a co-owner with Mr. Sanchez and/or Rich Mind

7   Records or was not an owner at all.

8          Defendant Triple D, LLC, was not the owner when it

9   filed the application for the Ghost Logo which is the '994

10   Trademark Registration.  At all times Mr. Sanchez states that he

11   has been the sole owner of the logo.

12          And to each of the three trademark registrations, it's

13   -- and this is key -- it's confusingly similar to the City's

14   logo.  And, further, each of the Defendant Triple D Gear, LLC's,

15   logos were deliberately selected to trade on them notoriety to

16   the City's logo and to falsely suggest an affiliation between the

17   City and the Defendant, Triple D Gear, LLC.

18          In finding for the City on Count Two, I will enter an

19   Order directing the United States Patent and Trademark Office to

20   rectify the registration by canceling all three of the trademarks

21   at issue:  U.S. Registration No. 4,586,688, U.S. Registration No.

22   6,330,048, U.S. Registration No. 6,141,994.

23          Now that's on Count Two.

24          Let me say on Count Three on the cancellation of

25   fraudulently-obtained trademark registrations under 15

1    United States Code Section 1120, I'm going to do some more

2    finding on that.  I may find for the City on Count Three but I'm

3    going to reserve my final ruling until such time as the Findings

4    of Fact and Conclusions of Law are entered, and I'll let you know

5    that at this time.

6            I don't really need to reach that because I've already

7    said that they're all three canceled.  I don't think I've gone

8    over all of that.  So I don't think I need to issue -- do any of

9    that.  So I'll issue some -- Y'all submit what you think on the

10   Findings of Fact and Conclusions of Law, and I'll review those at

11   the time.  You've already submitted some.  If you want to submit

12   something else based on what's happened here today, I'll review

13   those.

14           I appreciate y'all.  Thank you for your efforts on this

15   trial, and I look forward to having you back here again.

16           Ms. O'Laughlin, Mr. Norred, you're both welcome to be

17   in here anytime.  I appreciate it.  And I appreciate your efforts

18   and your hard lawyering on a hard case, and thank y'all very

19   much.  Y'all are excused.

20           COURT SECURITY OFFICER:  All rise.

21           (Court adjourned at 3:15 PM.)

22

23

24

25

112

CERTIFICATE OF OFFICIAL REPORTER


        I, Deborah A. Kriegshauser, Federal Official Realtime

Court Reporter, in and for the United States District Court for

the Northern District of Texas, do hereby certify that pursuant

to Section 753, Title 28, United States Code, that the foregoing

is a true and correct transcript of the stenographically-recorded

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the regulations of

the Judicial Conference of the United States.

        Dated this 24th day of October, 2025.


                        /s/ Deborah A. Kriegshauser
                        _____
                        DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                        FEDERAL OFFICIAL COURT REPORTER